AMERICAN MEDICAL INTERNATION-AL, INC., et al., Plaintiffs,

v.

SECRETARY OF HEALTH, EDUCATION AND WELFARE, Defendant.

Civ. A. No. 77–1921.

United States District Court, District of Columbia.

Feb. 2, 1979.

Philip W. Buchen, Washington, D.C., J. D. Epstein, Dennis M. Barry, Houston, Tex., Andrew Lichtman, Los Angeles, Cal., for plaintiffs.

Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U.S. Atty., Anthony J. Steinmeyer, Paul A. Gaukler, Washington, D.C., James C. Pyles, Baltimore, Md., David Palmer, for defendant.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

■ This case is before the Court on cross-motions for summary judgment. Plaintiffs are American Medical International [hereinafter, "AMI"], thirty-seven of its wholly owned subsidiary hospital corporations, and one hospital organization which AMI manages. The defendant is the Secretary of Health, Education and Welfare, who is responsible for the administration of Title XVIII of the Medicare Act, 42 U.S.C. §§ 1395 et seq. In this action, plaintiffs challenge a decision by the defendant concerning plaintiff hospitals' allowable Medicare reimbursement for reporting periods ending from June 30, 1973, through November 30, 1975. Plaintiffs seek resolution of four separate controversies which involve four different types of costs. The Medicare Act requires the defendant to reimburse provider hospitals for the reasonable costs of treating Medicare patients. These costs, which the defendant disallowed, are:

(1) stock maintenance costs—costs relating to annual reports, stockholders' meetings, mandatory filings with the Securities and Exchange Commission, proxies, and transfer of stock shares;

(2) costs relating to payment by certain plaintiff hospitals to Inhalation Therapy Service, Inc., for its contractual charges to them for respiratory therapy services;

(3) costs of certain plaintiff hospitals relating to interest expense, increased asset valuation, and increased goodwill arising from the purchase of 100 percent of the capital stock of corporations formerly owning and/or operating said plaintiffs; and

(4) costs relating to the payment of California and Florida franchise taxes.

According to the defendant, the amount in controversy in this case is roughly 1.9 million dollars, and because the costs are of a recurring nature, the allowance of these costs will have a substantial impact on the federal health care program.

Plaintiffs challenge the defendant's decision to disallow these costs on the grounds that such decision is arbitrary and capri-

cious, an abuse of discretion, inconsistent with the Medicare Act and implementing regulations, and unsupported by substantial evidence. In addition, plaintiffs allege that the provisions of the Provider Reimbursement Manual [hereinafter, "Manual"] relied upon by the defendant to disallow the costs involved, are substantive, rather than interpretive, in nature, and therefore are invalid because not promulgated as regulations pursuant to the Administrative Procedure Act. The Court has carefully studied the lengthy and comprehensive memoranda submitted by both sides and the entire record herein and finds that no genuine issues of material fact exist in this case and that, pursuant to Fed.R.Civ.P. 56, this case is amenable to disposition on motions for summary judgment. Accordingly, for the reasons hereinafter stated, the Court will grant defendant's motion for summary judgment as to all issues raised by plaintiffs, and deny plaintiffs' motion for summary judgment.

## I. BACKGROUND

This lawsuit arises under Title XVIII of the Social Security Act, commonly known as the "Medicare" program. 42 U.S.C. §§ 1395 et seq. This legislation provides for federal reimbursement of medical care for the aged and certain disabled persons. It consists of two basic components: Part A, under which the instant case arises, provides hospital insurance benefits to the elderly, 42 U.S.C. §§ 1395–1395i-2, while Part B, 42 U.S.C. §§ 1395j–1395w, involves a voluntary supplemental medical insurance program. Part C of Title XVIII, 42 U.S.C. §§ 1395x–1395pp contains definitions and general provisions applicable to Parts A and B. These three components of Title XVIII establish a reimbursement scheme for funding a beneficiary's covered health costs.

The hospital insurance benefits established under Part A are funded out of Social Security taxes. 42 U.S.C. § 1395i. Coverage under Part A extends to services rendered by providers as defined in 42 U.S.C. § 1395x(u), which included hospitals such as plaintiff hospitals. However, for a

hospital, or any other qualified provider, to participate in the Medicare program it must file an agreement with the Secretary of Health, Education and Welfare in which it agrees, among other things, not to bill patients eligible under the Medicare program for covered services. 42 U.S.C. § 1395cc. In turn, the Act provides that the provider is to be reimbursed by the government for its reasonable cost of providing such services, or, if lower, the customary charges for such services. 42 U.S.C. § 1395f(b).

A provider may be reimbursed for services rendered to Medicare beneficiaries directly by the Secretary, or it may appoint as a "fiscal intermediary" any qualified public or private agency to act as the Secretary's agent for the purpose of reviewing its claims and administering payments due it from the government. If a provider is dissatisfied with the fiscal intermediary's determination with respect to its claim for cost, it may request a hearing on this matter before the Provider Reimbursement Review Board. 42 U.S.C. § 1395oo. The Board's determination is the final agency action unless the Secretary, on his own motion and within 60 days after the provider of services is notified of the Board's decision, reverses or modifies the Board's decision. 42 U.S.C. § 1395oo (f)(1). The Secretary has delegated his authority to review the Board's decisions to the Administrator of the Health Care Financing Administration.

The Medicare program is structured around the concept of reasonable cost. Under that concept, a provider is to be reimbursed only for the reasonable cost of providing medical services to Medicare beneficiaries. The Medicare statute sets forth only the broadest definitional parameters, requiring reasonable cost to be

. . . the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services

. . . .

42 U.S.C. § 1395x(v)(1)(A). Beyond this threshold requirement, reasonable cost is to be determined under regulations promulgated by the Secretary

. . . establishing the method or methods to be used, and the items to be included, in determining such costs . . .

*Id.* These regulations must, however, take into account the direct and indirect costs necessary in the efficient delivery of covered services to Medicare beneficiaries so that such costs will not be borne by non-covered individuals. Conversely, the cost of rendering services to non-covered individuals is not to be borne by the Medicare Insurance Program.

Pursuant to his statutory authority, the Secretary has promulgated regulations to reimburse providers for their reasonable costs incurred in rendering medical services to Medicare beneficiaries. 42 C.F.R. §§ 405.401–488. At issue in this case is whether certain costs claimed by plaintiff hospitals are allowable as reasonable costs under those regulations or the Medicare statute itself.

After plaintiff hospitals initially submitted the costs at issue to their respective fiscal intermediaries, the intermediaries determined that these costs were not reimbursable under Medicare principles. They therefore disallowed these costs and adjusted plaintiff hospitals' cost reports to reflect this disallowance. Pursuant to 42 U.S.C. § 1395oo (b), plaintiff hospitals, together with their parent corporation, American Medical International, took a group appeal to the Provider Reimbursement Review Board. In a written decision issued September 8, 1977, the Board affirmed certain of the cost determinations of the fiscal intermediaries and reversed others. On September 15, 1977, the Administrator sent written notification to the parties of his intent to review the Board's decision. On November 4, the Administrator rendered his decision reversing those points on which the Board had disagreed with the fiscal intermediaries and reinstating the fiscal intermediaries determinations in full. Plaintiffs pursue this court action pursuant to 42 U.S.C. § 1395oo (f)(1), challenging the Administrator's disallowance of four distinct costs:

(1) stock maintenance costs

(2) related organization costs,

(3) 100% stock purchase of fifteen of the plaintiff hospitals, and

(4) franchise taxes.

## II. STANDARD OF REVIEW

Jurisdiction of this case lies in this Court pursuant to 42 U.S.C. § 1395oo (f). That provision also provides that the administrative decision "shall be tried pursuant to the applicable provisions under Chapter 7 of Title 5 [the Administrative Procedure Act]." The Administrative Procedure Act (APA) sets forth the scope of judicial review:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(b) contrary to constitutional right, power, privilege, or immunity;

(c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(d) without observance of procedure required by law;

(e) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(f) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due

account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706. Thus, the Court will review the decision of the Administrator which deals with a basic question of law—i. e., whether certain costs are "reasonable costs" within the meaning of 42 U.S.C. § 1395x(v)(1)(A)—to determine whether it is "not in accordance with law." *See Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *International Harvester v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973); *Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289 (8th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973).

 In the course of its review, the Court must recognize that because of the expertise of the agency, administrative decisions should be given deference. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). This is especially appropriate when Congress explicitly vests broad discretion in the agency to interpret a statute. *See Mourning v. Family Publications Services, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). The Medicare Act provides that reasonable costs "shall be determined in accordance with regulations [promulgated by the Secretary] establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions." 42 U.S.C. § 1395x(v)(1)(A). Apparently, Congress recognized the difficulty in defining the imprecise concept of reasonable costs and, therefore, Congress consciously chose to establish general statutory guidelines and authorize the agency to prescribe regulations to carry out the Act. *Springdale Convalescent Center v. Mathews*, 545 F.2d 943, 951

(5th Cir. 1977). *See Diplomat Lakewood, Inc. v. Califano*, 453 F.Supp. 442 at 445 (D.D.C.1978).

 Plaintiffs, however, suggest that this Court deviate from the normal rule of deference in this case because the decision of the Provider Reimbursement Review Board differed in substantial part from the Secretary's final decision. As noted, review by this Court shall be "pursuant to the applicable provisions [of the Administrative Procedure Act]." 42 U.S.C. § 1395*oo*(f).[1] It is well settled that, under the APA, final responsibility for rendering the decision lies in the agency itself, not in any subordinate hearing officers. This is because it is the agency, not any subordinate officers such as the Provider Reimbursement Review Board, that is charged with the responsibility for implementing and administering the agency's program. *See Environmental Defense Fund, Inc. v. EPA*, 160 U.S.App.D.C. 123, 489 F.2d 1247, 1253 (1973); *Hamlin Testing Laboratories, Inc. v. United States Atomic Energy Commission*, 357 F.2d 632, 637–38 (6th Cir. 1966); *McClatchy Broadcasting Co. v. FCC*, 99 U.S.App.D.C. 195, 239 F.2d 15, 18 (1956), *cert. denied*, 353 U.S. 918, 77 S.Ct. 662, 1 L.Ed.2d 665 (1957). As pointed out recently by the Court of Appeals for this Circuit,

> When final decisionmaking authority is vested in an administrative tribunal, the determinations of that body, and not the mere recommendations of its examiner, are the principal concern of a reviewing court. . . . And when the agency's final determination is adequately substantiated, that decision must prevail notwithstanding the defensibility of the examiner's view.

*Williams v. Bell*, 190 U.S.App.D.C. 343 at 349, 587 F.2d 1240, at 1246 (D.C.Cir. 1978)

---

1. It may be argued that the operative statute is 42 U.S.C. § 1395*oo*, not the Administrative Procedure Act, and, therefore, the normal rules under the latter, which require deference to the final agency decision, are inapplicable. However, the United States Court of Appeals for the Fourth Circuit has just recently held that this statute does not prescribe a drastic departure from prior administrative practice so as to alter the normal relationship between the agency and its subordinate hearing officers. *Fairfax Hospital Association, Inc. v. Califano*, 585 F.2d 602 at 612 (4th Cir. 1978), *citing Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

(footnotes omitted). Therefore, a difference of opinion between the Provider Reimbursement Review Board and the Administrator in this case, while considered as part of the whole record, does not require this Court to abandon the usual principle of deference to the expertise of an agency.[2]

## III. THE MERITS

A. *Stock Maintenance Costs Are Not Reimbursable Under the Medicare Act Because They Are Not Reasonable Costs Necessary For Providing Patient Care.*

During fiscal years ending August 31, 1973, and August 31, 1974, plaintiff American Medical International, a proprietary corporation, incurred costs referred to in the administrative hearing as stock maintenance costs. These costs consisted of (1) accounting and other costs relating to Securities and Exchange Commission filings; (2) stock transfer fees; and (3) costs relating to annual stockholders' reports and meetings. Plaintiff AMI had allocated a portion of these costs to the 38 plaintiff hospitals in this appeal, who in turn claimed them as allowable costs on their Medicare cost reports.

The fiscal intermediaries of the plaintiff hospitals denied medicare reimbursement for stock maintenance costs on the basis that (1) such costs are not costs of patient care because they are incurred primarily for the benefit of stockholders and (2) such costs are covered through the prescribed return on equity capital allowed to proprietary providers. The Provider Reimbursement Review Board reversed the intermediaries' disallowance of these costs. It concluded that these costs are indirect costs of patient care and thus allowable under the Medicare Act.

The Administrator found the Board's analysis to be erroneous and, accordingly, reversed its decision. The Administrator noted that these costs did not represent actual services, supplies or facilities furnished by the parent corporation, AMI, to its subsidiary providers. Moreover, these costs are not, the Administrator held, related to actual patient care and are unnecessary to the rendition of patient care services. Rather, they were costs associated with investment of the corporation's stockholders. Therefore, the Administrator concluded, these costs could not properly be allocated from AMI to its subsidiary providers, or otherwise recognized in the allowable costs of the subsidiaries. In addition, the Administrator noted the relationship of stock maintenance costs to the return paid on equity capital of proprietary providers under the Medicare program. This return on equity capital for proprietary providers is intended by statute to be in "lieu of other allowances to the extent that they reflect similar items." 42 U.S.C. § 1395x(v)(1)(B). Accordingly, the Administrator concluded that Congress intended to allow proprietary providers a return on investment in patient care facilities rather than allowing specific items of costs relating to investment, such as stock maintenance costs.

■ Under the Medicare Act, costs are only reimbursable if they are not "unnecessary in the efficient delivery of needed health services . . . ." 42 U.S.C. § 1395x(v)(1)(A). The issue here is whether stock maintenance costs are included in this definition. The Court concludes that stock maintenance costs are not reasonable costs *necessary* in providing medical services and therefore are not reimbursable.

A crucial distinction must be drawn between costs which are necessary for the

**2.** In attempting to circumvent this normal principle, plaintiffs claim that the Provider Reimbursement Review Board holds a status above that of most administrative law judges and, therefore, less deference need be shown to the agency's decision when a difference of opinion exists. Plaintiffs note that the members of the Board are required to be persons knowledgeable in the field, 42 U.S.C. § 1395oo (h), and that their decisions are final absent review by the Secretary. The Court finds these alleged differences between administrative law judges and Board members unpersuasive. The Court notes, however, that even if it were to adopt plaintiffs' suggestion that no deference need be shown the Administrator's decision, the Court's resolution of all the issues would not be altered.

maintenance of a corporate structure and those which are necessary for providing medical services. Stock maintenance costs are necessary for a corporation to exist, but medical service can be provided without the corporate form. The importance of this distinction is evidenced by the fact that the purpose of stock maintenance costs is to protect investors. *See, e. g., duPont v. Wyly*, 61 F.R.D. 615, 632 (D.Del.1973). Securities and Exchange Commission filings, annual stockholders' meetings and reports, stock transfer fees—all are directed at benefiting the shareholders' investments. Their relationship to the provision of health care is too remote[3] to allow them to be considered reasonable costs necessary to providing that care. *See Gosman v. United States*, 573 F.2d 31, 38 (Ct.Cl.1978) (advertising expenditures are not reimbursable because they are "only tangentially or speculatively related to the actual care of Medicare beneficiaries"); *Moody Nursing Home, Inc. v. Secretary of HEW*, CCH Medicare and Medicaid Guide ¶ 28,607 at 10,110–12 (N.D.Ga.1977).

■ Plaintiffs urge this Court to adopt the position that "stock maintenance costs are necessary to the corporate existence of AMI." Memorandum in Support of Plaintiff's Motion for Summary Judgment at 18 (August 28, 1978). This, however, misses the essence of the basis for reimbursement. While stock maintenance costs may be ordinary and necessary business expenditures of a corporate provider, this consideration is not controlling. *See Doctor's Hospital, Inc. v. Califano*, 459 F.Supp. 201 at 212 (D.D.C.

1978). The costs must be necessary to the furnishing of medical care. As already noted, medical care can be furnished by non-corporate entities; therefore, the necessary costs of maintaining a corporate entity are not, *ipso facto*, necessary for the provision of medical care. Accordingly, stock maintenance costs are not reimbursable under the Medicare program.

■ Plaintiffs argue that stock maintenance costs, though related to investment, should be reimbursed because Medicare allows proprietary providers a return on equity capital. 42 U.S.C. § 1395x(v)(1)(B).[4] By allowing this payment, plaintiffs contend, the Medicare program expressly recognized that costs related to investment may be reimbursed. This argument assumes that the return on equity capital in § 1395x(v)(1)(B) is a reasonable cost within the meaning of § 1395x(v)(1)(A). However, this return on equity provision was added subsequent to the passage of the Medicare Act and it constitutes the sole exception to the basic Medicare principle that reimbursement be limited to those costs actually incurred in providing patient care services. It is clear from the purpose behind the return on equity provision, (§ 1395x(v)(1)(B)), its legislative history, and the provision itself that the return on equity capital provision cannot be used by plaintiffs to support the position that reasonable costs under 42 U.S.C. § 1395x(v)(1)(A) was meant to include costs for investment.

Congress's purpose in amending the Medicare Act in 1966 to include this provi-

---

**3.** Plaintiffs argue that stock maintenance costs are related to obtaining and maintaining equity capital, which in turn reduces their costs of financing debt. This fact, plaintiffs contend, relates stock maintenance costs to the provision of medical services by lowering plaintiffs' costs of providing patient care services. The Court finds this sort of domino-theory argument unconvincing. The connection between the stock maintenance costs and the furnishing of medical services is too attenuated to justify Medicare reimbursement.

**4.** This provision reads:
Such regulations in the case of extended care services furnished by proprietary facili-

ties shall include provision for specific recognition of a reasonable return on equity capital, including necessary working capital, invested in the facility and used in the furnishing of such services, in lieu of other allowances to the extent that they reflect similar items. The rate of return recognized pursuant to the preceding sentence for determining the reasonable cost of any services furnished in any fiscal period shall not exceed one and one-half times the average of the rates of interest, for each of the months any part of which is included in such fiscal period, on obligations issued for purchase by the Federal Hospital Insurance Trust Fund.

sion was to encourage the expansion of post-hospital care facilities because of a perceived shortage of nursing home beds. 112 Cong.Rec. 27072 (October 20, 1966)[5]. By allowing a return on equity capital, investments in facilities would increase. Because the purpose of the return on equity capital provisions was to allow providers an incentive, the amendment had to give providers a reimbursement which was *not* already available to them under the principle of reimbursement for reasonable costs of providing medical care. Otherwise, it would not have been an incentive. In fact, because the return on equity capital places a limit on the reimbursable amount, the purpose of the amendment—as an incentive to providers—would not be served if the same expenditures had been *fully* reimbursable as reasonable costs of providing medical care prior to the enactment of the amendment. Therefore, the only conclusion that can be drawn is that the return on equity provision is an exception to the usual requirement that reimbursable costs be closely linked to providing medical care.

Further support for this can be found in the legislative history. Senator Long, in the Congressional debate leading to the passage of the return on equity capital provision, stated:

> The purpose of the Senate amendment was certainly laudable. What we sought was to guarantee to the individual who invested his funds in a facility organized for profit that he would receive a fair return on the money he had put into the operation. *As the proposed medicare regulations stood he would have been only reimbursed for the actual costs of providing services with no specific return given on his investment.*

112 Cong.Rec. 27608 (1966) (emphasis added). Several days later, Congressman Byrnes reiterated the fact that reasonable costs for providing Medicare care does not include costs for investment.

The medicine bill which we passed a year ago, provides for 100 days of post-hospital extended care. However, the bill specified that the amount which will be paid for post-hospital extended care—in other words, the amount that will be paid to the individual nursing home or facility—shall be, and I quote, "the reasonable cost" of furnishing such care. *In other words, as the law now stands, fundamentally all the Social Security Administration can pay are the costs, with no allowances for profits or a return on the invested capital.*

\* \* \* \* \* \*

This amendment provided here does make *a step toward recognizing [that] some return on investment* must be provided for the proprietary nursing home.

112 Cong.Rec. 28220 (1966) (emphasis added). Thus, it is clear that plaintiffs' interpretation of § 1395x(v)(1)(A), as allowing reimbursement for costs related to investment, is erroneous.

The statute itself lends support to this position. By its own terms, § 1395x(v)(1)(B) precludes recognition under § 1395x(v)(1)(A) of costs related to investment, such as stock maintenance costs. The statute states that the return on equity capital is to be "in lieu of other allowances to the extent that they reflect similar terms." 42 U.S.C. § 1395x(v)(1)(B). This phrase indicates Congress's intent that the prescribed rate of return on equity capital provided for by that section is to be the sole Medicare payment for the use of private investment capital in the provision of patient care services. Thus, stock maintenance costs, which are also related to private investment capital, are not reimbursable under any other provision except as part of the return on equity capital.

 In addition to their argument based on the return on equity capital provi-

---

**5.** Though no such shortage existed with respect to acute care hospital beds, the legislative history of the equity capital amendment, when that amendment was before the Conference Committee, indicates that it was Congress' expectation that the "same or comparable principles" would be applied by the Secretary with respect to proprietary hospitals. Conf.Rep.No. 2317, 89th Cong., 2d Sess. 3 (1966), U.S.Code Cong. & Admin.News 1966, p. 3676.

sion, plaintiffs raise a plethora of challenges to the Secretary's decision not to reimburse stock maintenance costs as a reasonable cost of furnishing medical care. First, plaintiffs claim that it is inconsistent for the Secretary to reimburse the stock maintenance costs of nonprofit corporations, while denying such reimbursement to profit corporations. However, this distinction is rational because the purpose of annual meetings, filings, etc., of non-profit corporations is not for investment but, rather, to further the goal of providing improved medical care. On the other hand, the *primary* purpose of annual meetings, filings, etc., of profit corporations is to enhance investments. Of course, certain activities at the annual meeting of profit corporations may relate to furnishing medical care. But " '[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations . . .' " *Weinberger v. Salfi*, 422 U.S. 749, 769, 95 S.Ct. 2457, 2469, 45 L.Ed.2d 522 (1975). Classification in the area of social welfare often cannot be made with "mathematical nicety." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). "Social welfare legislation, by its very nature, involves drawing lines . . that necessarily are sometimes arbitrary." *Califano v. Aznavorian*, —— U.S. ——, 99 S.Ct. 471, 474, 58 L.Ed.2d 435 (1978). *See Fairfax Hospital Association v. Califano*, 585 F.2d 602 at 606 (4th Cir. 1978). Consequently, the "primary purpose" test used by the Secretary is reasonable and justifies the difference in treatment between non-profit and profit corporations.

■ Similarly, the primary purpose test answers plaintiffs' challenge to the Secretary's decision to reimburse certain costs of corporate organizing incident to the creation of the entity, while denying reimbursement for stock maintenance costs. The primary purpose of all costs incurred at the creation of the entity is to bring into existence a provider of medical services.

As the entity survives, the stock maintenance costs have as their primary purpose the protection of stockholder interests in investment. This is a rational distinction justifying the different treatment accorded the different costs by the Secretary.

■ Plaintiffs next argue that the allowance of interest expense and other costs incurred in borrowing is inconsistent with the denial of reimbursement for stock maintenance costs. Interest expense, along with other finance charges, is a reimbursable cost when the borrowed funds are used by a provider for patient care. Plaintiffs contend that it is arbitrary to reimburse these costs and deny reimbursement of stockholder servicing costs, because the latter are an aspect of equity financing. The Court finds this not to be arbitrary in that interest on debts used solely for funding patient care facilities is primarily incurred for providing medical care. Debts not so used are not reimbursable. 42 C.F.R. § 405.419. *However, even if stock maintenance costs may benefit medical services by assisting in the attraction of equity capital, this effect is too incidental to override the fact that the primary purpose of stock maintenance costs is to enhance investment.*

Furthermore, plaintiffs claim that the prohibition in 42 U.S.C. § 1395x(v)(1)(A) against requiring necessary costs of rendering services to Medicare beneficiaries to be borne by non-Medicare patients mandates that stock maintenance costs be reimbursed so as not to shift this cost to non-Medicare patients. The fallacy in this argument is that the statute only refers to the necessary costs of rendering services; stock maintenance costs, as has already been demonstrated, fall outside this category.

■ Lastly, plaintiffs contend that Provider Reimbursement Manual § 2134.9 and § 2150.2B [6]—which disallow reimbursement of stock maintenance costs—should be set aside because they establish a rule whose issuance did not conform to the Administrative Procedure Act. The Act requires no-

---

**6.** Plaintiffs challenge Manual § 2122.4, § 1217, Social Security Ruling 75–22 and the Wolkstein letter on the same basis. The Court's resolu-

tion of the issue in this part of this Memorandum Opinion applies as well to these other matters discussed in other parts of the Opinion.

tice of proposed rulemaking in the Federal Register, with an opportunity for comment by interested members of the public. However, 5 U.S.C. § 553(b)(A) excludes from these requirements "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." The Court finds that these provisions of the Manual are "interpretive rules" because they were issued to advise the public of the agency's construction of the statute which it administers. Davis, Administrative Law 126 (3d ed. 1972). *See Sierra Vista Hospital, Inc. v. Weinberger*, CCH Medicare & Medicaid Guide, ¶ 27,440 at 9870–71 (C.D. Ca.1975) (merely interpretative aids clarifying what costs are reimbursable). Therefore, Manual § 2134.9 and § 2150.2B are valid exercises of the Secretary's discretion and will not be set aside.

In sum, the Court finds that stock maintenance costs are not reimbursable under the Medicare Act because they are not reasonable costs necessary for providing medical care.

B. *The Charge of Respiratory Care Services Furnished by Inhalation Therapy Services Is Not Reimbursable Because Plaintiff Has Not Shown by Convincing Evidence the Applicability of the Exception to the Related Organization Rule.*

Inhalation Therapy Services (ITS) was formed in 1963 for the purpose of providing respiratory therapy services to hospitals. In April 1969, plaintiff AMI contacted ITS to negotiate for respiratory therapy services for eight of its subsidiary hospitals. A contract was agreed upon, and ITS began to provide respiratory services to the eight facilities on June 1, 1979.

In September 1969, plaintiff AMI acquired 100 percent of ITS's stock. After the stock purchase, ITS continued its operations as a wholly owned subsidiary of AMI. In 1971, the contract between ITS and the eight subsidiary hospitals of plaintiff AMI was amended to include significant new additional services as well as adjust the computation of fees. Subsequent to the merger with AMI, ITS expanded its operations in rendering respiratory therapy services to 22 related hospitals (i. e., subsidiaries of plaintiff AMI) and 29 nonrelated hospitals as of August 31, 1973; 22 related hospitals and 46 nonrelated hospitals as of August 31, 1974; and 27 related hospitals and 120 nonrelated hospitals as of August 31, 1975.

The 27 plaintiff hospitals who were receiving services from ITS claimed as an allowable cost the amount charged by ITS. The fiscal intermediaries determined that these hospitals, including the eight with whom ITS had contracts prior to its merger with AMI, were related organizations within the meaning of 42 C.F.R. § 405.427. The intermediaries further concluded that the plaintiffs had not demonstrated by convincing evidence that the exception in 42 C.F.R. § 405.427(d) was applicable. Therefore, under the regulation, the intermediaries allowed as reimbursable cost to plaintiff hospitals only the *cost* to ITS in providing respiratory services.

The Provider Reimbursement Review Board reversed the intermediaries' determination. It concluded that plaintiffs had shown the exception to be applicable. The Board therefore allowed the full amount charged by ITS for respiratory services as an allowable cost on plaintiff hospitals' Medicare cost reports. As a result of its decision on the application of the exception, the Board did not reach the question of whether the eight plaintiff hospitals which had contracted with ITS in 1969 were related parties within the meaning of 42 C.F.R. § 405.427.

The Administrator reversed the Board's decision. He concluded that the plaintiffs had not proved by convincing evidence, as they were required to do, that all of the criteria in section (d) of 42 C.F.R. § 405.427 had been met. In particular, the Administrator concluded that the providers had not shown (1) that a "substantial part," as interpreted by § 1010.1 of the Provider Reimbursement Manual, of ITS's "business activity of the type carried on with the provider is transacted with others than the provider

and organizations related to [ITS] by common ownership or control. . . ."; (2) that there is an "open, competitive market for the type of services, facilities, or supplies furnished by [ITS] . . ."; (3) that the services, facilities or supplies are those which commonly are obtained by institutions such as the provider from other organizations; (4) that services provided by ITS "are not a basic element of patient care ordinarily furnished directly to patients by such institutions . . ."; and (5) that ITS's charges to the providers are comparable to charges in the open market. Moreover, the Administrator determined that the eight plaintiff hospitals which had contracted with ITS in 1969 were related parties within the meaning of 42 C.F.R. § 405.427. He, therefore, reinstated the intermediaries' initial determination in full.

The "related organization principle" is set forth at 42 C.F.R. § 405.427, which states:

> Cost applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in allowable cost of the provider *at the cost to the related organization.* However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

(Emphasis added). As a wholly owned subsidiary of AMI, ITS and AMI are related parties within the meaning of 42 C.F.R. § 405.427. Therefore, AMI would normally be reimbursed for the contract fees charged by ITS to AMI only to the extent of the cost to ITS. However, an exception exists in 42 C.F.R. § 405.427(d). All parties interpret this regulation as setting forth four criteria which the provider must demonstrate by convincing evidence for the exception to apply.

1. That the supplying organization is a bona fide separate organization;
2. That a substantial part of the supplying organization's business activity of the type carried on with the provider is transacted with other organizations not related to the provider and the supplier by common ownership or control and there is an open competitive market for the type of services, facilities, or supplies furnished by the organization;
3. That the services, facilities, or supplies are those which commonly are obtained by an institution such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions; and
4. That the charge to the provider is in line with the charge for such services, facilities, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such services, facilities, or supplies.

Manual § 1010. The issue in this case is whether plaintiffs have demonstrated by "convincing evidence" the applicability of the last three criteria of the exception.[7] The Court, upon careful consideration of the purpose underlying the criteria for the exception, finds that plaintiffs have failed to meet their burden.[8]

■ The interpretation of the relevant criteria must be controlled by the purpose behind the exception. The general related organizations rule is based on the notion

---

7. The Administrator did not conclude that the first criterion had not been met and, therefore, that one is not in issue here.

8. The Secretary appears to contend, without much analysis, that the standard of review the Court should apply is one of "substantial evidence." This is normally the appropriate standard when reviewing an agency record. However, the Secretary would thus have this Court decide, based on a review of the whole record, whether there is substantial evidence to support the agency's conclusion that plaintiff has not shown by convincing evidence the applicability of the exception. Such a tortured manner of review is both unwieldy and, probably, inappropriate. The better manner of review, and the one this Court will adopt here, is simply whether plaintiffs have met their burden by convincing evidence. This is a question of law and one which the Court has authority to set aside if the agency's decision is "not in accordance with law." 5 U.S.C. § 706(2)(a).

that because only the "actually incurred" costs of providing services to Medicare beneficiaries are reimbursable, 42 U.S.C. § 1395x(v)(1)(A), when a provider purchases services from an organization owned or controlled by the provider, it is, in effect, purchasing services from itself. 42 C.F.R. § 405.427(c)(2). To reimburse the charge from the supplying organization would be inconsistent with the statutory requirement that Medicare reimbursement be limited to costs "actually incurred" because this charge contains a profit element which is not reimbursable. *See Lockwood Hospital, Inc. v. Califano*, No. 76–H–240, slip op. at 10 (S.D. Texas February 10, 1978); *Fairfax Hospital Association, Inc. v. Mathews*, 459 F.Supp. 429 (E.D.Va.1977), affirmed, 585 F.2d 602 (4th Cir. 1978). In other words, the related organization rule guards against "sweetheart" contracts between providers and suppliers, which would result in the reimbursement of profit, contrary to the statute. *See Fairfax Hospital Association v. Mathews, supra*, slip op. at 7. Because there might be circumstances where transactions between related organizations would not result in such abuse, the Secretary established a narrow exception to the application of the related organization rule in 42 C.F.R. § 405.427(d).

Plaintiffs contend that the purpose of the exception is to assure that there will be a means of comparing charges made to unrelated providers with charges made to related providers—a sort of "measuring rod." Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 60, 64 (August 28, 1978). While this may well be a factor relevant to the exception, the basic purpose of the exception is broader in scope. The exception attempts to isolate those contracts between related entities in which the charge to the provider ought to be reimbursed because the supplier does not exist merely to serve the provider and, thereby, increase the reimbursement to the provider for the profit element contained in the charge. Accordingly, the Court, in *Lockwood, supra*, recognized that

> [t]he regulation is not by its terms concerned with the reasonableness of the charges between related organizations. . . . All the regulation does is provide that if two organizations are really one as far as the questioned transaction is concerned, by virtue of common ownership or control, then there is to be no reimbursement for a step-up in the price between the two.

Slip op. at 10. In fact, if the only purpose of the exception were to be a "measuring rod" to test the reasonableness of the charge to the provider, then the first three criteria would be superfluous because the fourth criterion provides a sufficient measuring rod. Moreover, even if the charge were reasonable, it would be contrary to the "actually incurred" language of the Medicare Act to reimburse a provider the charge—including profit—of a supplier, which merely exists to serve the provider. Therefore, contrary to plaintiffs' contention, the measurement of the charge could not have been the only purpose behind the exception.

Considering the purpose of the criteria that comprise the exception, the Court concludes that the Secretary's interpretation of his own regulation is reasonable and, based on this interpretation, the plaintiffs have failed to show by convincing evidence that the criteria have been met. The second criterion requires the plaintiffs to demonstrate by convincing evidence that

> a substantial part of its [ITS's] business activity of the type carried on with the provider is transacted with others than the provider and organizations related to the supplier by common ownership or control and there is an open, competitive market for the type of services, facilities, or supplies furnished by the organization.

42 C.F.R. § 405.427(d). Because the purpose of this criterion was to prevent recognition of charges by a supplier whose fundamental purpose for existence is to serve the related provider, the Secretary has reasonably interpreted this criterion to

> cover situations where goods and service are supplied to the general public and *only incidentally are furnished to related organizations.*

Manual § 1010.1 (emphasis added).[9] The evidence presented by plaintiffs does not demonstrate convincingly that ITS conducted substantially all of its business activities with unrelated providers and only incidentally with providers owned by AMI. Although the percentage of ITS's revenue from unrelated providers was 52 percent, 64 percent and 67 percent, respectively, for the three years in issue, this is not "substantial" within the meaning of the criterion. In fact, the evidence indicates that ITS expanded services to unrelated hospitals only *after* the needs of AMI's hospitals were satisfied.[10] Thus, plaintiffs have not demonstrated by convincing evidence that substantially all of ITS's business activity was conducted with unrelated providers while services were only incidentally furnished to related organizations.

Under the second half of this criterion, providers must demonstrate by convincing evidence that there is "an open, competitive market for the type of services, facilities or supplies furnished by the [related] organization." The purpose of this is that if an open, competitive market exists—and a related provider is in a position to and did compare bids—this is evidence that the related supplier does not exist merely to serve the related provider. *See Fairfax Hospital Association, Inc., supra* at 24. However, in this case, plaintiffs have presented no evidence that any other contract suppliers were in a position to offer competition to ITS for the business of servicing the related providers. In fact, there was evidence indicating that no AMI–owned hospitals received respiratory therapy services under contract from any company except ITS.[11] Accordingly, plaintiffs have failed to establish the second criterion for the exception to the related organization rule.

The third criterion requires the plaintiffs to demonstrate by convincing evidence

> that the services, facilities or supplies are those which commonly are obtained by institutions such as the Provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions.

42 C.F.R. § 405.427(d). This criterion is directed at providers who set up suppliers to furnish services normally provided directly by the providers themselves. The reason for this is that if providers normally furnish the services themselves, the related supplier was probably set up merely to serve the related provider, and to thereby inflate the amount reimbursable through Medicare. The only evidence presented by plaintiffs which directly addressed the question of whether these services are commonly obtained by contract showed that in 1977, only 16 percent of hospitals (1160 out of 7156) contracted for respiratory therapy services with outside organizations.[12] However, 1977 statistics are not in issue here and 16 percent does not satisfy the criterion that such services are "commonly" obtained by contract.

---

9. It should be noted that what is involved here is the Secretary's interpretation of the agency's own regulation. While deference is normally accorded an agency's expertise in interpreting a statute enacted by Congress, *see Sea-Land Service, Inc. v. Kreps,* 185 U.S.App.D.C. 98, 566 F.2d 763, 778 (1977), such deference should certainly be accorded the agency's interpretation of its own regulation. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), *quoting Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).

10. During 1970, 1971, and 1972, the percentage revenue of ITS from unrelated entities was 50 percent, 38 percent, and 43 percent, respectively.

11. Administrative Record at 898.

12. Administrative Record at 889. Although plaintiffs introduced evidence as to the number of hospitals which obtained respiratory care services under contract in 1973 and 1975, they did not introduce any statistics as to 1974, another year in issue. More significantly, plaintiffs, having the burden of proof, introduced no evidence indicating the total number of hospitals during those years. In the absence of a comparison of the number of hospitals contracting for the services with the total number of hospitals, it is impossible to determine whether the practice is "common[ ]."

The second half of the third criterion (that respiratory therapy is not a basic element of patient care ordinarily furnished directly to patients by hospitals) has also not been established by plaintiffs. The threshold issue here is the meaning of "basic element of patient care." Plaintiffs contend that the phrase refers to those services which are necessary to the very existence of the hospital, namely, routine nursing service care, room and board. The Court cannot accept this narrow reading of the phrase because this would render the criterion meaningless. In order to meet the definition of the term "hospital" under the Medicare Act, a facility must provide 24-hour nursing service. 42 U.S.C. § 1395x(e)(5). Therefore, unless a hospital did itself provide these "basic element[s] of patient care," the Act would not apply and the need for the criterion (as interpreted according to plaintiffs' definition) would be nonexistent. On the other hand, the Secretary contends that the phrase means "usual patient care," which includes routine and ancillary services. This is supported by the testimony of a representative from the Bureau of Health Insurance, which was responsible for drafting 42 C.F.R. § 405.427. In addition, this interpretation is reasonable and consistent[13] with the purpose behind the exception, which is to prevent excessive reimbursement to providers who arrange with a related supplier for it to dedicate its existence to supplying the provider with routine and ancillary services.

The fourth criterion requires the plaintiffs to demonstrate by convincing evidence that the charge to the related provider is in line with the charge for such services, facilities, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such services, facilities, or supplies.

Plaintiffs attempt to establish this criterion by showing that ITS charges related and unrelated hospitals comparable percentages of the revenues generated by their respiratory therapy departments. However, no effort was made to demonstrate that the charge for particular services was comparable among AMI and non-AMI hospitals; nor was any effort made to show that these charges were in line with those prevailing in the open market. A comparison of percentages is not sufficient to establish that the *"charge . . . for such services, facilities, or supplies is in line with the charge for such services, facilities, or supplies in the open market . . ."* 42 C.F.R. § 405.427(d) (emphasis added). While the percentages could theoretically be comparable, the charge for identical service might nevertheless vary. Without specific evidence indicating the comparability of charges per service or charges in the open market, plaintiffs have not demonstrated that the fourth criterion has been satisfied.

In sum, plaintiffs have failed to establish by convincing evidence that the criterion for the exception to the related organization rule has been met. Therefore, the Court must conclude that the charge of respiratory services furnished by ITS is not reimbursable.[14]

---

13. Plaintiffs attempt to point out an inconsistency in the Secretary's position. Plaintiffs refer to a Manual provision illustrating the operation of the exception which cites drugs and pharmacy operations as an example which satisfies the criteria of 42 C.F.R. § 405.427(d). Because the provision of drugs is no less an element of patient care than the provision of respiratory therapy, plaintiffs argue that the Secretary cannot consistently contend that the former satisfies the "not a basic element" condition, while the latter does not. The flaw in this line of reasoning is that drugs *can* be a basic element of patient care and still satisfy the criterion for the exception as long as drugs are "not a basic element of patient care *ordinarily furnished directly to patients by such institutions.*" (Emphasis added). In other words, the criterion should *not* be read to require that the services be (1) not a basic element of patient care and (2) not ordinarily furnished directly to patients by such institutions. All the services need be to satisfy this part of the criterion is not a basic element that is ordinarily furnished by the provider.

14. Plaintiffs claim that the related organization rule should not be applied to several contracts executed between eight AMI hospitals and ITS *before* AMI and ITS became related parties. Plaintiffs would be correct if the contracts were

C. *The Costs Claimed by Plaintiff Hospitals Arising From the Purchase of Their Stock by Chanco Company Are Not Reimbursable Under the Medicare Act.*

Between 1969 and 1972, Chanco Medical Industries, which merged with plaintiff AMI in 1972, purchased 100 percent of the outstanding capital stock of fifteen of the plaintiff hospitals. In exchange for each provider's stock, Chanco paid cash, notes, and stock. Chanco obtained an independent appraisal of each of these providers and allocated the purchase price of each provider's stock on its books between goodwill and an account reflecting the appraised value of the acquired provider's physical plant. None of the individual plaintiff hospitals merged with Chanco, however. Rather, each continued to operate as a separate corporate entity.

In August 1972, plaintiff American Medical International, through a wholly owned subsidiary corporation, merged with Chanco Company, with plaintiff AMI being the surviving corporation. Following this merger, AMI allocated and recorded on the books of the individual providers the increased asset valuation and goodwill previously recorded on Chanco's books. Subsequently, nine of the 15 plaintiff hospitals claimed depreciation in their Medicare costs reports based on this revaluation of their physical assets.[15] This was done on the assumption that Chanco's purchase of plaintiff hospitals' stock constituted purchases of an ongoing facility within the meaning of 42 C.F.R.

§ 405.415(g). Similarly, these nine used this higher valuation of their assets in computing their return on equity, under 42 C.F.R. § 405.429 and, moreover, they included that portion of Chanco's purchase price attributable to goodwill in their return on equity computation. They also claimed as a cost related to medical care, interest on debt incurred by Chanco to purchase their stock.[16]

The respective fiscal intermediaries of plaintiff hospitals determined that there had not been a "purchase of ongoing facilities" within the meaning of the regulations because the purchase of stock is not the purchase of assets. They therefore made adjustments to reduce depreciation, interest and return on equity costs claimed by the nine providers. Six of the fifteen providers did not claim the interest or increased asset valuations and goodwill on their cost reports on the advice from their respective intermediaries.

The nine providers who claimed increased asset valuations and goodwill and interest on their cost reports, as well as the six who did not, raised this issue in their appeal to Provider Review Reimbursement Board. The Board ruled that it did not have jurisdiction to consider the claims of the six providers who had failed to claim these costs in their Medicare cost reports. With respect to the claims of the nine providers, it held that increased asset valuation and goodwill recorded on plaintiff hospitals' books by AMI could not be used as a basis for calculating depreciation or return on

in fact entered prior to AMI and ITS becoming related. *See Northwest Community Hospital, Inc. v. Califano,* 442 F.Supp. 949, 951 (S.D.Iowa 1977). However, the Court finds that new contracts were entered into by all eight hospitals *after* AMI and ITS became related. In fact, these new contracts included significant new additional services as well as adjustments to the computation of fees.

15. Under the Medicare regulations, depreciation on buildings and equipment is an allowable cost. 42 C.F.R. § 405.415. Depreciation is to be based on "the historic cost of the asset," 42 C.F.R. § 405.415(a)(2), which is defined as the cost "incurred by the present owner in acquiring the asset." 42 C.F.R. § 405.415(b)(1). The price paid by the purchaser of a facility shall be

the cost basis for that facility if the purchaser can demonstrate that the sale was (1) "a bona fide sale" and (2) the price did not "exceed the fair market value of the facility at the time of the sale." 42 C.F.R. § 405.415(g).

16. Under the Medicare regulations, "[n]ecessary and proper interest on both current and capital indebtedness is an allowable cost." 42 C.F.R. § 405.419. However, for interest to be "necessary" within the meaning of the regulations it must (1) "be incurred on a loan made to satisfy a financial need of the provider," and (2) "be incurred on a loan made for a purpose reasonably related to patient care." 42 C.F.R. § 405.419(b)(2).

equity under the Medicare Act. Similarly, the Board held that the interest on loans used to acquire plaintiff hospitals' stock was not reimbursable under the Medicare Act.

The Administrator, expanding on the legal rationale of the Board's decision, affirmed it on all accounts. The Administrator pointed out that 42 C.F.R. § 405.415 provides for a change in asset valuation for depreciation purposes only where the assets are purchased in a bona fide sale. In this instance, there was no purchase of assets as ownership of the assets in question remained with the individual providers. Moreover, he noted that the cost of those assets to the providers in question did not change as a result of the sale of the stock. Accordingly, the providers could not claim increased valuation in their depreciation and return on equity costs. Likewise, the Administrator determined that the providers could not receive as an allowable cost interest incurred on the loan used to purchase their stock, for this interest was neither incurred to satisfy a financial need of the providers nor related to patient care, the two prerequisites under 42 C.F.R. § 409.419(b)(2). As for goodwill, the Administrator noted that none of the providers in question had purchased goodwill as a result of the stock transfer. Any goodwill, the Administrator pointed out, was acquired by Chanco Company and, therefore, not properly attributable to the individual providers. Further, for those acquisitions occurring after July 31, 1970, the Administrator noted, the applicable regulation explicitly excludes goodwill from return on equity capital computations. 42 C.F.R. § 405.429(b)(2).[17]

■ Three separate issues are raised with respect to the purchase by Chanco (plaintiff AMI's predecessor) of 100 percent of the stock of the plaintiff hospitals here involved. They are whether the medicare regulations allow plaintiff hospitals: (1) to revalue their tangible assets for depreciation purposes; (2) to claim an interest expense for the interest on the loans obtained by Chanco to finance its purchase of their stock; and (3) to include this increased asset valuation, as well as goodwill, in their equity capital computation. The Court finds none of these costs reimbursable in this case.

To participate in the Medicare program and to be eligible for Medicare payments, a provider must file an agreement with the Secretary pursuant to 42 U.S.C. § 1395cc. While the agreement is in effect, the Secretary will reimburse the *provider* for its reasonable costs of providing patient care to beneficiaries eligible under the program. Such costs are reimbursable only to the extent that they are "actually incurred." 42 U.S.C. § 1395x(v)(1)(A). The providers in this case are the plaintiff hospitals, not Chanco. Both before and after the stock transfer, plaintiff hospitals, not their owners, were and are the providers of medical services within the meaning of the Medicare Act. Only *their* reasonable costs in rendering medical services to beneficiaries can be reimbursed.

■ *Depreciation.* Under 42 C.F.R. § 405.415, providers may claim as an allowable cost, depreciation on their tangible assets, which is "[b]ased on the historical cost of the asset." 42 C.F.R. § 405.415(a)(2). "Historical cost" is defined as the cost "incurred by the present owner in acquiring the asset." 42 C.F.R. § 405.415(b). Because assets may be revalued only upon their acquisition, plaintiff hospitals cannot revalue their assets upon the stock transfer to Chanco because no assets were required. Basic corporate law indicates that assets of a corporation are owned by the corporate entity, not the stockholders. *Moline Properties v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). Thus, ownership of corporate facilities is unaffected by the sale or purchase of stock. The assets belonged to the plaintiff hospitals both before and after the stock transfer. In fact, it would only make sense to allow plaintiff hospitals to be reimbursed for the depreciation costs of assets *that the*

---

17. The stock of four of the plaintiff hospitals in question was acquired after July 31, 1970.

*plaintiff hospitals themselves acquired* because the statute only permits reimbursement for costs "actually incurred." 42 U.S.C. § 1395x(v)(1)(A). This must mean "actually incurred" by the *provider* because it is the provider that is being reimbursed. Reimbursement for depreciation from a cost established by the expenditure of Chanco, the stockholder, would be to allow reimbursement for costs not "actually incurred" by plaintiff hospitals, the providers, and would, therefore, be contrary to the Act. The regulations reflect this by permitting reimbursement only for the acquisition of facilities, 42 C.F.R. § 405.415, and by establishing the provider's basis for determining depreciation costs as the cost "in acquiring the asset," 42 C.F.R. § 405.415(b). Consequently, plaintiff hospitals cannot revalue their tangible assets under 42 C.F.R. § 405.415.

*Interest.* Under 42 C.F.R. § 405.419, providers may claim as an allowable cost "[n]ecessary and proper interest on both current and capital indebtedness." However, to be "necessary," the interest must "[b]e incurred on a loan made to satisfy a financial need of the *provider*" and "[b]e incurred on a loan made for a purpose reasonably related to patient care." (Emphasis added). It becomes clear that these criteria are not met here when one realizes that the interest sought to be reimbursed is interest *paid by Chanco* for loans with which to purchase the stock. The interest was not incurred to satisfy a financial need "of the provider," i. e., the plaintiff hospitals; rather, the interest was incurred to satisfy a financial need of Chanco to expand its ownership. Nor was the interest incurred for a purpose reasonably related to patient care but was, in fact, incurred for investment purposes. The criteria in these regulations are required by the statute because authority exists only to reimburse the actual costs incurred by the *provider* in furnishing patient care. Accordingly, plaintiff hospitals

may not claim interest on loans incurred by Chanco for the purchase of their stock.

*Increased asset valuation and goodwill.* Under 42 C.F.R. § 405.429, proprietary providers are allowed a return on equity capital. The return on equity capital is based on (1) a *"provider's* investment in plant, property, and equipment relating to patient care . . .," and (2) net working capital maintained for necessary and proper operation of patient care activities. 42 C.F.R. § 405.429(b). Here, the providers—the plaintiff hospitals—have not made any purchase of a plant, property or equipment. All that has transpired is that while the providers purchased nothing, another company bought the ownership of the providers. There is no reason to reimburse plaintiff hospitals because they have not expended any funds. Therefore, plaintiff hospitals cannot claim increased asset valuation or goodwill in their return on equity computation because if they could do so, they would be reimbursed beyond the costs they "actually incurred." 42 U.S.C. § 1395x(v)(1)(A).[18]

Plaintiff hospitals contend that the issue of whether a purchase of stock is to be treated as a purchase of assets is controlled by generally accepted accounting principles, which, they claim, treats the purchase of 100 percent stock as the purchase of assets. For support, they rely upon 42 C.F.R. § 405.406 which, according to plaintiff hospitals, requires generally accepted accounting principles to be applied in determining reimbursable costs, unless the applicable cost regulations clearly indicate otherwise.[19] This analysis is flawed in several respects. First, as has already been demonstrated, applicable cost regulations—42 C.F.R. §§ 405.415, 405.419, and 405.429—do indicate "otherwise." Second, this provision only provides that accepted accounting practices be used in uniform record-keeping, not in determining costs allowable under the Medicare Act. The regulation is directed at the type of financial data and

---

18. Because of the Court's resolution of this issue, it need not reach plaintiff hospitals' claim that the four hospitals acquired by Chanco after August 1, 1970, are entitled to reimbursement in spite of the terms of 42 C.F.R. § 405.-

429(b)(2), which restricts the period for which reimbursement will be allowed.

19. Administrative Record at 2052–54.

reports required of providers; it is not a regulation affecting the substantive provisions of the program as to what constitutes reimbursable costs. Third, and perhaps most significantly, the accounting principles enunciated in Accounting Principles Board Opinion No. 16, relied upon by plaintiff hospitals, are only applicable to the records of the corporation purchasing the stock. A purchasing corporation is allowed, under generally accepted accounting principles, to record on its books the full cost of a 100 percent stock purchase of a second corporation. However, APB–16 does not provide for a stepped-up basis on the books of the second corporation, such as plaintiff hospitals.[20] Consequently, generally accepted accounting principles are not controlling in determining the costs reimbursable to the plaintiff hospitals.[21]

Although it may seem a matter of form over substance for the purchase of assets to result in a significantly different effect than the purchase of 100 percent of the stock, there is a rational basis for this distinction, consistent with the statute. The Act, as noted several times already, only permits reimbursement to the provider for the reasonable cost actually incurred by the provider in providing medical services. Regulations which prevent reimbursement for stock transfers are valid because the provider has not incurred any costs. Only the owner of the provider has and these are not reimbursable. Moreover, the purchase of assets is primarily related to the provision of medical services, while the purchase of stock is primarily related to investment.[22]

Accordingly, the regulations, which allow reimbursement only for costs associated with the purchase of assets, while denying it for costs associated with the purchase of 100 percent of the stock, are reasonable in light of the statute and will be upheld.

D. *Franchise Taxes Based Upon Net Income Are Not Reimbursable Under the Medicare Act, But Such Taxes Must be Included in the Computation of Equity Capital.*

Certain of the plaintiff hospitals operate in California and Florida. Both of these states have a franchise tax on corporations doing business within their respective boundaries which is based on the corporation's net income. Plaintiff hospitals paid the franchise tax to their respective states for the cost reporting periods in dispute and claimed them as allowable costs under the Medicare program on their cost reports. The fiscal intermediaries refused reimbursement because the franchise taxes were based upon the plaintiff hospitals' net income. The Provider Review Reimbursement Board affirmed the intermediaries' determination, except for the $200 minimum tax imposed by California, which the Board ruled was allowable under the Medicare program.

Upon review, the Administrator affirmed the Board's decision, except for the $200 minimum tax which it held was not allowable under the Medicare principles. The Administrator found the California and Florida franchise taxes unallowable under the Medicare Act because they were taxes

---

**20.** Indeed, Chanco did *not* record the cost of the purchase of the stock on the books of plaintiff hospitals. Plaintiff hospitals, accordingly, did not claim Medicare reimbursement for asset valuation and goodwill while under the control of Chanco. It was not until plaintiff AMI acquired ·Chanco that these costs were recorded on the books of plaintiff hospitals and that they attempted to claim Medicare reimbursement based upon the purchase of their stock by Chanco.

**21.** Plaintiffs also contend that the Secretary is estopped by a statement in the Foreward to the Provider Reimbursement Manual from applying any test other than generally accepted accounting principles. The statement requires

the application of generally accepted accounting principles "for any cost situation that is not covered by the manual's guidelines and policies." However, the Court finds that the regulations do give guidance as to the cost reimbursement for costs claimed by plaintiff hospitals because of Chanco's purchase of stock.

**22.** In fact, had Chanco purchased the assets of the plaintiff hospitals, it would have been able to claim costs based on its purchase of the facilities because then it could have become a "provider" and, thereby, file a new provider agreement as required by 42 C.F.R. §§ 405.625 and 405.626.

based upon a corporation's net income. As such, plaintiff hospitals' franchise tax liability resulted from profit earned in providing medical services. Therefore, such liability was not a cost related to patient care but rather one directly related to investment. In this regard, the Administrator pointed out that except for the return on equity capital allowed by 42 C.F.R. § 405.429, costs related to investment are not allowed under the Medicare program. In response to plaintiff hospitals' contention that disallowing franchise taxes paid in Florida and California arbitrarily discriminates between providers in those two states and those in states where a basis other than net income is utilized, the Administrator pointed out that the Medicare program was not designed to assure that providers in different states would retain the same amount of after-tax income. The rate of tax and the types of tax are, the Administrator stated, the responsibility of the individual states.

In his decision, the Administrator also noted the providers' contention that the California and Florida franchise taxes are not income taxes but taxes imposed on corporations for the privilege of doing business within their respective states. He concluded, however, that while this distinction may be significant in other areas of state and federal law, it is not significant under Medicare principles which make the basis for the tax the decisive factor. In this regard, the Administrator noted that it was beyond question that the basis for the California and Florida franchise taxes is net income.

A second question concerning franchise taxes at issue in this proceeding is whether franchise tax liability should be considered in determining the net working capital necessary for the proper operation of patient care activity. Such necessary net working capital forms part of a proprietary provider's equity capital on which the return on equity capital, allowed under 42 C.F.R.

§ 405.429(b), is computed. As net working capital is obtained by subtracting a provider's current liabilities from its current assets, the effect of including franchise tax liability in this computation is to decrease the equity capital in the return on equity capital computation, thereby reducing the provider's return. In their cost determinations, the fiscal intermediaries included franchise tax liability in this computation. In his affirmance of the intermediaries' and the Provider Reimbursement Review Board's decision, the Administrator explained that the intent of the regulation, 42 C.F.R. § 405.429, is to allow a return only on that portion of equity capital which is related to patient care. Because franchise taxes are not related to patient care, the Administrator reasoned, it is necessary to remove the liability for franchise taxes from a provider's working capital which forms part of the computation for the return on equity.

Plaintiffs contend that the Administrator's decision is inconsistent with 42 U.S.C. §§ 1395f(b) and 1395x(v). The former sets forth the general proposition that a provider is to be reimbursed for its reasonable costs of providing medical services. "Reasonable cost" is determined in accordance with 42 U.S.C. § 1395x(v)(1)(A), which requires that providers be reimbursed for the costs actually incurred, including direct and indirect costs found not to be "unnecessary in the efficient delivery of needed health services." Plaintiffs argue that because a franchise tax is a cost of doing business, it should be reimbursed as indirectly related to patient care.

The Court finds, however, that liability for franchise taxes based upon net income [23] is not a cost incurred in providing medical services. Liability for such a tax accrues only where a hospital earns a profit; it is a direct consequence of an investment. Were a hospital at the break-even point, it would

**23.** Both the franchise tax statutes of California and Florida are based on net income. Although plaintiffs contend that California's tax is based on other criteria as well, the California Supreme Court has held that the state franchise tax is one measured by a corporation's net income. *West Publishing Co. v. McColgan,* 27 Cal.2d 705, 166 P.2d 861, *affirmed,* 328 U.S. 823, 66 S.Ct. 1378, 90 L.Ed. 1603 (1946); *Rosemary Properties, Inc. v. McColgan,* 29 Cal.2d 677, 177 P.2d 757 (1948).

incur no franchise tax as a result of income.[24] Consequently, the franchise tax based on net income is not necessary for the "efficient delivery of needed health services" because it arises merely as a result of a provider's desire for profit.[25] As such, franchise taxes based on net income are not reimbursable under the Medicare Act. *See Sierra Vista Hospital, Inc. v. Weinberger*, CCH Medicare and Medicaid Guide ¶ 27,440 (C.C.A.1975).

Plaintiffs contend that there should be no difference in effect between franchise taxes based on income and those based on other criteria. In other words, according to plaintiffs, franchise taxes should either be included or not, but the basis of the tax should be irrelevant. This result, however, overlooks the purpose of the Medicare program, which is to reimburse providers only for their reasonable costs and actual costs incurred in *rendering medical services* to Medicare beneficiaries. A connection between the tax and the rendering of medical services is essential. Whether such a connection exists can only be determined by a consideration of why the tax is imposed. If the tax is imposed because of the amount of income accrued, this basis for the tax is too remotely related to the furnishing of medical care to be reimbursed.[26] Therefore, the basis for the franchise tax is relevant and may properly be considered by the Secretary.

■ Plaintiffs next argue that Medicare should reimburse Florida and California franchise taxes because return on equity allowed under the program generates such tax liability. In short, plaintiffs seem to be arguing that because Medicare's return on equity provision encourages profitmaking, it would be unfair for the Secretary to deny

reimbursement for costs generated by the profit. First, the mere fact that a specific Medicare provision encourages profitmaking does not transform all costs resulting from such profit into costs of providing medical services. Otherwise, all income taxes would be reimbursable and this clearly was not Congress's intent in enacting the Medicare Act. Second, this argument turns the return on equity capital provision on its head. The purpose of the provision was to provide an incentive to providers, in addition to reimbursement of their actually incurred costs, to provide medical services to Medicare beneficiaries. However, Congress expressly limited the amount of such reimbursement to one and one-half times the average of the rates of interest on obligations issued for purchase by the Federal Hospital Insurance Trust Fund. 42 U.S.C. § 1395x(v)(1)(B). Therefore, the Court rejects plaintiffs' attempt to convert a provision that expressly limits reimbursement into a basis for expanding it.

■ Furthermore, plaintiffs claim that failure to reimburse providers in Florida and California for franchise taxes paid to those states arbitrarily discriminates against providers of services in these states as opposed to states where a franchise tax is measured by criteria other than net income. This argument overlooks the policy underlying the Medicare Act which explains the reason for the distinction between franchise taxes not based on net income and those based on it. The Act is not designed to correct differences in the methods used by various states in computing their franchise taxes. The purpose of the Medicare program is to reimburse providers for their reasonable costs, not to ensure providers in different states the same after-tax income.

24. In California, a provider incurs a minimum *franchise tax liability* of $200.00 regardless of whether it has net taxable income. Medicare will reimburse a provider for this $200.00 if it has no net taxable income.

25. In fact, as the Secretary also notes, such a *franchise tax does not increase the "actual cost"* of any medical service rendered to Medicare beneficiaries, but rather reduces the amount of profit that the company has gained

from its operation. Because the Medicare Act indicates that reimbursable cost was meant to be "actual cost" incurred by providers, the franchise tax based on income would not be reimbursable.

26. This is true whether the franchise tax is characterized as an income tax or an excise tax. It is the basis of the tax that must be considered, not its general classification.

In this way, the distinction is far from arbitrary.

Next, plaintiffs contend that Medicare's failure to reimburse franchise taxes based upon net income results in these taxes being borne entirely by private paying patients, which is expressly prohibited by 42 U.S.C. § 1395x(v)(1)(A). This argument assumes the conclusion; that is, while this provision does provide that "necessary costs of efficiently delivering covered services" not be borne by patients not covered by the Act, the provision is only violated *if* franchise taxes based on net income are "necessary costs of efficiently delivering covered services." Because, as has already been demonstrated, these taxes are not such costs, the provision is not violated.

▮ Moreover, plaintiffs allege that failure to reimburse franchise taxes results in profit and nonprofit providers being treated unequally in contravention of 42 C.F.R. § 405.402(b)(5). First, that provision only requires nonprofit and profitmaking organizations to be treated "equitably," not necessarily equally. It is equitable to reimburse the franchise tax of a nonprofit provider because that tax is related to patient care, while refusing to reimburse the franchise tax of a profitmaking provider which is related to income. Second, because of the return on equity provision which is only available to profitmaking hospitals, the reimbursement to them may well exceed the reimbursement to nonprofit hospitals. Therefore, plaintiffs' point proves too much; to adopt its rationale would eliminate the return on equity provision because it is not available to nonprofit hospitals.

Finally, plaintiffs argue that if franchise taxes are not reimbursable, it is inconsistent to include franchise liability in the return on equity capital computation. For purposes of the computation of a reasonable return, equity capital is defined by 42 C.F.R. § 405.429(b) as follows:

(1) The provider's investment in plant, property and equipment *related to patient care* (net of depreciation) and funds deposited by a provider who leases plant, property, or equipment *related to patient*

*care* and is required by the terms of the lease to deposit such funds (net of non-current debt related to such investment or deposited funds), and

(2) Net working capital maintained for necessary and proper operation of *patient care* activities. (Emphasis supplied).

Accordingly, plaintiffs note that only liabilities related to the care of patients are to be considered in the computation of the amount of equity capital on which to base a rate of return and the net worth of the provider is to be

adjusted for those assets *and liabilities* which are not related to the provision of patient care.

Manual § 1202.1 (Emphasis added). Therefore, according to plaintiffs, liabilities (such as a franchise tax), as well as assets deemed not related to patient care, should be omitted from the determination of equity capital.

This approach misses the mark. These regulations do clearly establish that a return on equity capital is only allowed on that portion of equity capital related to patient care. Therefore, liabilities not related to patient care (such as franchise taxes based on net income) must be *subtracted from working capital* to arrive at the net working capital necessary and proper for patient care services. This is accomplished by *including* the franchise tax liability in the return on equity capital computation. In other words, plaintiffs argue that because franchise taxes based on net income (under the Secretary's theory) are unrelated to patient care, they should be excluded from the computation. However, only by *including* them in the computation as a liability, and then *subtracting* them from the assets related to patient care will the net working capital related to patient care be determined. Accordingly, it is consistent with the regulations to include franchise taxes in the computation of the return on equity capital.

In sum, the Court finds that franchise taxes based upon net income are not an allowable cost under the Medicare Act, but

628

that such taxes must be included as a liability in the computation of equity capital.

## IV. CONCLUSION

The Court finds, first, that stock maintenance costs are not reimbursable under the Medicare Act because they are not reasonable costs necessary for providing medical care in that their primary purpose is enhancing investment interests, while medical care can be provided absent the corporate structure. Second, the Court finds that the charge of respiratory care services furnished by Inhalation Therapy Services is not reimbursable because plaintiffs have not shown by convincing evidence the applicability of the exception to the related organization rule. Specifically, plaintiffs have failed to demonstrate by convincing evidence (1) that a substantial part of ITS's business was transacted with unrelated hospitals and that an open competitive market existed for inhalation therapy services; (2) that the services provided by ITS are commonly obtained by hospitals from other organizations and that those services are not a basic element of patient care ordinarily furnished by hospitals; and (3) that ITS's charges were in line with the charges for those services in the open market and no more than charges by the related organization to others under comparable circumstances. Third, the Court finds that the costs claimed by plaintiff hospitals arising from the purchase of their stock by Chanco Company are not reimbursable under the Medicare Act because such costs were not actually incurred by the providers, plaintiff hospitals. Finally, the Court finds that the franchise taxes based upon net income are not reimbursable under the Medicare Act, because such taxes are not necessary for the "efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). In addition, franchise taxes based upon net income must be included in the computation of the return on equity capital as a liability in order that the net working capital related to patient care be properly determined. Accordingly, the Court will grant defendant's motion for summary judgment and deny plaintiffs' motion for summary judgment.

An Order in accordance with the foregoing will be issued of even date herewith.