SUN TOWERS, INC., et al., Plaintiffs-Appellants Cross-Appellees,

v.

Margaret M. HECKLER *, Secretary, Department of Health and Human Services, Defendant-Appellee Cross-Appellant.

No. 82–1481.

United States Court of Appeals, Fifth Circuit.

Feb. 21, 1984.

Rehearing Denied April 2, 1984.

---

\* The name of the present Secretary is ordered substituted for the name of her predecessor, Richard S. Schweiker, pursuant to Fed.R.App. P. 43(c).

Weissburg & Aronson, Inc., Ronald N. Sutter, Washington, D.C., Robert A. Klein, Patric Hooper, Los Angeles, Cal., for Sun Towers, Inc.

Thomas W. Coons, Health Care Financing Div., Dept. of HHS, Baltimore, Md., Anthony J. Steinmeyer, Atty., Civ. Div., Wendy M. Keats, Washington, D.C., for Margaret M. Heckler.

Before BROWN and RANDALL, Circuit Judges, and HUNTER **, District Judge.

RANDALL, Circuit Judge:

Plaintiffs in this suit are forty-seven hospitals that are owned and operated by Hospital Corporation of America ("HCA"). The defendant is the Secretary of Health and Human Services, who is responsible for the administration of Title XVIII of the Medicare Act, 42 U.S.C. §§ 1395 *et seq.* (1976 & Supp. V 1981). The Medicare Act requires the Secretary to reimburse provider hospitals for the reasonable costs of treating Medicare patients. The Act also requires the Secretary to pay corporate providers of such services a return on equity invested in hospital facilities. The plaintiffs petitioned the district court to review a final decision of the Secretary denying payment of the following costs and returns on equity capital claimed by the plaintiffs to be due to them under Medicare:

(1) Stock maintenance costs—costs attributable to stock transfer and registration fees, mandatory filings with the Securities and Exchange Commission ("SEC"), stockholders' meetings, and public relations directed at institutional investors;

(2) A return on equity capital invested in goodwill that was purchased through 100% stock acquisitions of hospitals;

(3) Costs of unconsummated acquisitions; and

(4) A return on equity capital invested in aircraft used in the construction of HCA hospitals.

Both the plaintiffs and the Secretary moved for summary judgment. The district court granted the plaintiffs' motion for summary judgment on the stock maintenance costs issue, but granted the Secretary summary judgment with respect to the other issues.

On appeal, the plaintiffs argue that the Secretary's disallowance of unsuccessful acquisition costs and returns on net equity in goodwill and in aircraft used in hospital construction is arbitrary and capricious. Moreover, the plaintiffs also contend that the Secretary's disallowance of these costs was untimely, and hence invalid. The Secretary argues that the stock maintenance costs were properly disallowed and that the district court erred in finding to the contrary.

** District Judge of the Western District of Louisiana, sitting by designation.

For the reasons set forth below, we hold that the district court erred in reversing the Secretary's disallowance of the stock maintenance costs and thus reverse on this issue. We affirm, however, the district court's summary judgment against the plaintiffs with regard to the other three claims, and find that the Secretary's disallowance of these claims was timely.

## I. BACKGROUND.

### A. Medicare.

This case arises under Title XVIII of the Social Security Act, known as the Medicare program. 42 U.S.C. §§ 1395a–1395xx. This legislation provides for federal reimbursement of medical care for the aged and certain disabled persons. 42 U.S.C. § 1395c. It accomplishes this, in part, through contractual arrangements with medical facilities to be "providers" of such medical care.[1] These providers afford certain covered medical services to the program's beneficiaries, for which they receive reimbursement from the government. 42 U.S.C. § 1395f. A provider is reimbursed for the "reasonable cost" of the services provided or, if lower, the customary charges for such services. 42 U.S.C. § 1395f(b)(1) (1976). In addition to "reasonable costs," Medicare also pays, in certain instances, a "reasonable return on equity capital, including necessary working capital, invested in a facility and used in the furnishing of . . . services. . . ." 42 U.S.C. § 1395x(v)(1)(B). Under this return on equity capital principle, proprietary providers, such as the plaintiffs, receive a specific return on their "investment in plant, property, and equipment related to patient care," and on their "net working capital maintained for . . . patient care activities." 42 C.F.R. § 405.429(b) (1982).

A provider may be reimbursed for services rendered to Medicare beneficiaries directly by the Secretary, or it may appoint as a "fiscal intermediary" any qualified public or private agency to act as the Secretary's agent for the purpose of reviewing its claims and administering payments due it from the government. These private entities are frequently health and accident insurance companies such as Blue Cross and Aetna. Each provider files an annual cost report with its fiscal intermediary, which audits the report and then issues a notice of program reimbursement informing the provider of the amount of reimbursement to which it is entitled. 42 C.F.R. § 405.1803 (1982). If a provider is dissatisfied with the fiscal intermediary's determination, it may request a hearing on this matter before the Provider Reimbursement Review Board (the "Board").[2] 42 U.S.C. § 1395oo(a). The Board's determination is the final agency action unless the Secretary, "on his own motion," reverses or modifies the Board's decision. 42 U.S.C. § 1395oo(f)(1). The Secretary has delegated her authority to review the Board's decision to the Administrator of the Health Care Financing Administration ("HCFA").[3] The Administrator has, in turn, re-delegated this authority to the Deputy Administrator. The provider has a right to judicial review from the Board's decision or from the Secretary's subsequent action.

### B. Facts.

HCA began operations in 1968 as a single hospital. It rapidly began to acquire and construct other hospitals, principally in the South and Southwest. By 1973, the cost year in dispute, HCA owned and operated forty-seven hospitals.

---

**1.** 42 U.S.C. § 1395x(u):

The term "provider of services" means a hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, or home health agency, hospice program, or, for purposes of section 1395f(g) and section 1395n(e) of this title, a fund.

An entity is an authorized Medicare provider by virtue of a contract, called an 1866 agreement, between it and the Secretary. Such contracts arise under § 1866 of the Social Security Act, 42 U.S.C. § 1395cc.

**2.** The Board consists of five members appointed by the Secretary. All five must be expert in the area of cost reimbursement; at least one must be a certified public accountant. 42 U.S.C. § 1395oo(h).

**3.** 42 Fed.Reg. 13,262 (1977) and 42 Fed.Reg. 57,351 (1977).

Plaintiffs are the forty-seven Medicare providers in the chain owned and operated by HCA, which serves as the home office. Medicare recognizes that home offices provide central management and administrative services, and reimburses home office costs to the extent these services relate to patient care. In 1973, certain "home office" expenses were claimed on HCA's home office cost report to be allocated to the members in the chain. HCA's fiscal intermediaries, however, disallowed these costs and the plaintiffs took a group appeal to the Board. The Board found in favor of the plaintiffs on four of six issues. Thereafter, the Secretary reversed the Board's decision on the four issues decided in favor of the plaintiffs. The plaintiffs then sought judicial review before the district court, challenging the Secretary's reversal of the Board's decision, and contending that the Secretary's decision was untimely.[4] The four disputed issues are (1) stock maintenance costs, (2) return on goodwill, (3) unsuccessful acquisition costs, and (4) return on aircraft equity. Subsequently, the district court upheld the Secretary's decision on all but the stock maintenance costs issue.

## II. TIMELINESS OF THE SECRETARY'S DECISION.

Because the timeliness of the Secretary's decision necessarily determines whether we must consider the merits, we address this issue first.

Both the Secretary's review process and judicial review of her decisions are governed by 42 U.S.C. § 1395oo(f)(1). This section provides in pertinent part:

(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by

the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received.

Thus, under the plain wording of the statute, the Secretary's decision is without legal effect if it was rendered more than "60 days after the provider of services [was] notified of the Board's decision . . . ."

The Board's decision is dated January 2, 1980. On the same day it was mailed to the plaintiffs and hand-delivered to the Office of the Attorney-Advisor, which is responsible for preparing the Deputy Administrator's decisions. The plaintiffs received the Board's decision on January 7, 1980.

The Deputy Administrator's decision reversing the Board on all four issues presently upon appeal is dated March 6, 1980, 64 days after the Board's decision was rendered but 59 days after it was received by the plaintiffs. The letters transmitting copies of the Deputy Administrator's decision are dated March 11, 1980, 69 days after the Board's decision and 64 days after the plaintiffs received the Board's decision.

The plaintiffs contend that the Secretary's decision is untimely for three reasons. First, they argue that the 60-day statutory period allowed for secretarial reversals of the Board begins to run from the date the Board's decision is rendered and mailed to the parties. Thus, the Secretary's decision is invalid because it is dated more than 60 days after the Board's decision was mailed to the parties. Second, the plaintiffs maintain that the Secretary is collaterally estopped from contesting that the 60-day period runs from the date of the Board's decision as a result of an earlier court decision adverse to the Secretary on this issue. Third, the plaintiffs argue that the date the Secretary's reversal became effective is the date on which the decision became a matter of public record, rather than the date affixed to the decision. Therefore, the Secretary's decision became "public" when

---

**4.** The plaintiffs did not seek judicial review of the Board's decision with regard to the two issues decided in favor of the intermediaries.

mailed to the plaintiffs on March 11, 1980, more than 60 days after the Board's decision was rendered and received by the plaintiffs.

### A. Meaning of "is notified."

The plaintiffs contend that the term "is notified," as used in the first sentence of section 1395oo(f)(1), should be interpreted as occurring on the date the Board's decision is *mailed* to the provider, rather than the date on which the provider *receives* this decision. Thus, they argue that the Secretary's decision was untimely because it is dated March 6, 1980, 64 days after the Board's decision was mailed to the plaintiffs. In support of this contention, they note the term "is notified," used in the first sentence of section 1395oo(f)(1), is in marked contrast to the second sentence establishing a 60-day period for obtaining judicial review. The second sentence expressly states that a civil action seeking review of the agency's decision must be "commenced within 60 days of the date on which notice *is received*." (Emphasis added.) The plaintiffs note also that we have held that it is an "established rule of construction that a term carefully employed in one place and excluded in another should not be implied where excluded." *KCMC, Inc. v. F.C.C.*, 600 F.2d 546, 550 (5th Cir.1979). *See also Diamond Roofing Co. v. Occupational Safety and Health Review Commission*, 528 F.2d 645, 648 (5th Cir.1976). Thus, they contend that the fact that the second sentence of section 1395oo(f)(1) expressly refers to the receipt of notice but the first sentence does not clearly indicates that receipt is not a requirement of the notice referred to in the first sentence of the section.

We do not find that the use of the term "is received" in the second sentence of section 1395oo(f)(1) precludes us from interpreting "is notified" to mean when notice of the Board's decision is received. Arguably, the common understanding of "is notified" is that of actual notice, and the term is synonymous with "is received." Simply because Congress used "is notified" with re-

gard to the secretarial review provision, rather than "is received," as was used in connection with judicial review, is not reason enough for us to find that the terms were intended to have different meanings.

Our review of the statute's legislative history, which the plaintiffs ignore, lends considerable weight to this view. In its original form section 1395oo(f) read, in pertinent part, as follows:

(f) A decision of the Board shall be final unless the Secretary, on his own motion, and within *60 days after the provider of services is notified of the Board's decision,* reverses or modifies (adversely to such provider) the Board's decision. In any case where such a reversal or modification occurs the provider of services may obtain a review of such decision by a civil action commenced within *60 days of the date he is notified of the Secretary's reversal or modification.*

86 Stat. 1420, 1422 (1972) (emphasis added).

Thus, section 1395oo(f), when enacted in 1972, employed the term "is notified" with respect to both the secretarial and judicial review portions of the statute. The House Committee on Ways and Means report accompanying this legislation interpreted the "is notified" language of the secretarial review provision to mean that "the Board's decision shall be final unless reversed or modified . . . within 60 days after the provider *receives* notification of the Board's decision." H.R.Rep. No. 92–231, 92d Cong., 1st Sess., *reprinted in* 1972 U.S.Code & Ad. News 4989, 5309 (emphasis added). Similarly, with regard to the judicial review portion of the statute, the Committee interpreted the "is notified" language to mean that a provider could obtain judicial review of the Secretary's decision "if such action is filed within 60 days of *receipt of notice* of the Secretary's determination." *Id.* (emphasis added). Thus, the legislative history of section 1395oo(f)(1) demonstrates that Congress interpreted the term "is notified" to mean the date upon which notice is received. The terms "is notified," "receives notification," and "receipt of notice" were

used interchangeably and treated as being synonymous.

In 1974, Congress amended section 1395*oo*(f) to expand the availability of judicial review of cases where the Secretary chooses not to modify or reverse a Board decision. The second sentence of section 1395*oo*(f)(1) was modified to read that an action for judicial review would have to be commenced within "60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received." In enacting this amendment, Congress left untouched the "is notified" language of the secretarial review portion of section 1395*oo* (f)(1).

The plaintiffs would have us believe that Congress' failure to change the "is notified" language of the secretarial review provision so as to parallel the "is received" modification in the judicial review provision demonstrates that Congress intended "is notified" to mean something other than receipt of notice. We note that the Congressional reports accompanying the 1974 amendment fail to suggest that Congress, in enacting the amendment, intended to alter its understanding of "is notified" to mean something different than "is received." Furthermore, when the amendment was first introduced to the Senate, Senator Walter F. Mondale explained that the amendment was for the sole purpose of offering providers the right of judicial review of any Board decision or subsequent modification or reversal by the Secretary. Senator Mondale noted that "[t]his amendment would not alter in any way the administrative appeals procedures currently provided for in [section 1395*oo* (f)(1) ]." 119 Cong.Rec. 38,631 (1974). In light of this legislative history, we are reluctant to interpret "is notified" and "is received" as having different meanings.

The plaintiffs argue next that the term "is notified" contained in the secretarial review provision of section 1395*oo*(f)(1) must be interpreted to occur on the date of mailing in order to be consistent with the Secretary's interpretation of the word "notice" in 42 U.S.C. § 1395*oo*(a)(3). That section allows a provider to appeal to the Board "within 180 days after notice of the intermediary's final determination . . . ." *Id.* The Secretary's regulation provides that this appeal must be filed "within 180 days of the date the *notice* of the intermediary's determination . . . was *mailed* to the provider . . . ." 42 C.F.R. § 405.1841(a) (emphasis added). This regulation interprets the statutory term "notice" as occurring on the date of mailing. Thus, the plaintiffs argue, if the intermediary's notice to the provider occurs on the date of mailing, consistency requires the Board's notice to the provider referred to in the first sentence of section 1395*oo*(f)(1) also to occur on the date of mailing.

The House Committee report accompanying section 1395*oo*(a)(3) states that, in order to obtain Board review, the provider must file a request for a hearing "within 180 days *after notice* of the intermediary's final determination." H.R.Rep. No. 92–231, 92d Cong., 1st Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4989, 5309 (emphasis added). Thus, the Secretary's interpretation of "notice" to mean the date of mailing, rather than the date of receipt, is neither supported nor contradicted by the legislative history. But the issue of whether the Secretary's interpretation of "notice" in section 1395*oo*(a)(3) is reasonable is not before us and, in any case, we cannot allow the Secretary's interpretation of another subsection of the statute to override Congress' clear understanding of "is notified" as employed in section 1395*oo*(f)(1). While the Secretary's regulations accompanying section 1395*oo*(f)(1) could have been more explicit as to the meaning of "is notified,"[5] we

---

**5.** At the time the Deputy Administrator's decision was rendered, 42 C.F.R. § 405.1875 provided in pertinent part:

(b) The Secretary will promptly notify all parties to the Board's hearing of his election to review the Board's decision and of the result of such review.

(c) If the Secretary reverses, affirms, or modifies a decision of the Board, he must do so within 60 days after notification to the provider of the Board's decision.

interpret the term to mean receipt of notice.[6]

### B. Collateral Estoppel.

■ We are not the first to wrestle with the meaning of "is notified" as found in the secretarial review provision of section 1395 oo(f)(1). In *McCoy v. Harris,* No. C77–0389 L(A) (W.D.Ky. Feb. 27, 1980), the court held that the 60-day period for secretarial review begins to run as of the date of the Board's decision. The plaintiffs insist that because this issue was decided against the Secretary in *McCoy,* the Secretary should be collaterally estopped from litigating it here. They point out that *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), has given the federal courts discretion to allow "offensive" use of collateral estoppel, which they maintain is appropriate here.[7]

■ Subsequent to oral argument in this case, the Supreme Court decided *United States v. Mendoza,* —— U.S. ——, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), which held that nonmutual offensive collateral estoppel cannot be used against the government. In *Mendoza,* Mendoza, a Filipino national, filed a petition for naturalization under the Nationality Act of 1940, 8 U.S.C. §§ 1001–1005 (1940 ed. Supp. V). His claim for naturalization was based on the assertion that the government's administration of the Nationality Act denied him due process of law. Neither the district court nor the Court of Appeals for the Ninth Circuit reached the merits of his claim because they held that the government was collaterally estopped from litigating that constitutional issue as a result of an earlier decision brought by other Filipino nationals in another district court. In reversing the Ninth Circuit, the Court held that "*Parklane Hosiery's* approval of nonmutual offensive collateral estoppel is not to be extended to the United States." *Mendoza, supra,* at —— – ——, 104 S.Ct. at 571–72. The Court found that "a rule allowing nonmutual collateral estoppel against the government . . . would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal

Subsequent to oral argument in this case, § 405.1875 was amended to provide that if the Administrator decides to review a Board's decision, "the Administrator will make this decision within 60 days after the provider received notification of the Board decision and will promptly mail a copy of the decision to each party and to HCFA." 48 Fed.Reg. 45,774 (1983) (to be codified at 42 C.F.R. § 405.-1875(g)(2)). This change arose from the need "to clarify procedures and policies that have been identified through experience as subject to differing interpretations." 48 Fed.Reg. 45,-766 (1983).

6. The plaintiffs also argue that if the 60-day periods for secretarial and judicial review of Board decisions both run from the date of receipt, a provider which received an adverse decision from the Board would have to file suit on the sixtieth day after receiving notice of the Board's decision in order to preserve its appeal rights even though the Secretary might reverse the Board on that date and thereby make judicial review unnecessary. Thus, the plaintiffs argue, if the 60-day period for secretarial reversal began when the Board's decision was rendered, then, 60 days after the provider received notice of this decision, the provider would know whether it was necessary to seek judicial review. This argument assumes that the Board's notice would always be mailed to the provider; if the provider received the Board's decision on the date it was rendered, the provider would face the same dilemma the plaintiffs have described. However, the Secretary's regulation was recently amended to provide that "the Administrator will promptly notify the parties and HCFA whether he or she has decided to review a decision of the Board. . . ." 48 Fed.Reg. 45,774 (1983) (to be codified at 42 C.F.R. § 1875(d)(1)).

7. Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party. In *Parklane* the Supreme Court upheld the use of collateral estoppel provided that the following conditions are met: (1) the party asserting collateral estoppel could not easily have joined in the action relied on; (2) the party against whom collateral estoppel is being asserted had the incentive to defend the first action vigorously; (3) the judgment relied on is not inconsistent with any previous decisions; and (4) there are no procedural opportunities in the second action which were unavailable in the first action which might be likely to cause a different result. 439 U.S. at 331–32, 99 S.Ct. at 651–52.

issue. Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." *Id.* at ——, 104 S.Ct. at 572 (citations omitted). The Court also noted that "application of nonmutual estoppel against the government would force the government to appeal every adverse decision in order to avoid foreclosing further review." *Id.* Such a rule would tax the government's limited resources and further crowd the dockets of the courts. *Id.* In conclusion the Court said:

> The conduct of government litigation in the courts of the United States is sufficiently different from the conduct of private civil litigation in those courts so that what might otherwise be economy interests underlying a broad application of collateral estoppel are outweighed by the constraints which peculiarly affect the government. We think that our conclusion will better allow thorough development of legal doctrine by allowing litigation in multiple forums. Indeed, a contrary result might disserve the economy interests in whose name estoppel is advanced by requiring the government to abandon virtually any exercise of discretion in seeking to review judgments unfavorable to it. The doctrine of res judicata, of course, prevents the government from relitigating the same cause of action

against the parties to a prior decision, but beyond that point principles of nonmutual collateral estoppel give way to the policies just stated.

*Id.* at ——, 104 S.Ct. at 574 (footnote omitted).[8] Thus, we hold that *Mendoza* forecloses the use of nonmutual estoppel against the Secretary here.[9]

### C. Effective Date of the Deputy Administrator's Decision.

Finally, the plaintiffs contend that, even if the 60-day period for secretarial review begins to run from the date that providers receive notice of the Board's decision, the Secretary's decision was untimely. Although the Deputy Administrator's decision is dated March 6, 1980, it was not mailed until March 11, 1980, 64 days after the date on which the plaintiffs received the Board's decision. The plaintiffs maintain that it was not until this second date, March 11, 1980, that the Deputy Administrator's decision became "effective."

The plaintiffs assert that an agency decision must be placed in the "public domain" before it becomes effective. They cite the Federal Rules of Civil Procedure which require that a judicial decision must first be placed in the public domain before it constitutes a "final judgment."[10] Yet the administrative rules governing the Secretary's review do not require the entry of her decisions in an official docket; hence, we can-

---

**8.** The Court's opinion is not devoid of any ambiguity with regard to the scope of its holding. Even though it states that *"Parklane Hosiery's* approval of nonmutual collateral estoppel is not to be extended to the United States," *Mendoza, supra,* at ——–——, 104 S.Ct. at 571, it also says that "nonmutual offensive collateral estoppel ... does not apply against the government in such a way as to preclude relitigation of issues *such as those involved in this case,"* *id.* at ——, 104 S.Ct. at 574 (footnote omitted) (emphasis added). At one point the Court also says that "the United States may not be collaterally estopped *on an issue such as this...."* *Id.* at ——, 104 S.Ct. at 570 (emphasis added). Because we find that the reasons the Court enunciates for its decision apply to all issues, and not just constitutional ones, we find *Mendoza* controlling here.

**9.** The Secretary also argues that the *Parklane* prerequisites to use of collateral estoppel have

not been satisfied in this instance; namely, that the "judgment relied on," *McCoy, supra,* "is not inconsistent with any previous decisions." She cites two cases which she claims are contrary to *McCoy: Hospital San Jorge v. Secretary of Health, Educ. and Welfare,* 616 F.2d 580 (1st Cir.1980), and *Villa View Community Hosp., Inc. v. Harris,* Medicare & Medicaid Guide (CCH) ¶ 30,503 (S.D.Cal.1980). Because we have decided that offensive collateral estoppel can not be invoked in this case, it is unnecessary for us to determine whether the above cited cases are inconsistent with *McCoy.*

**10.** The plaintiffs cite Fed.R.Civ.P. 58 which provides that "[a] judgment is effective only when ... entered as provided in Rule 79(a)." Fed.R. Civ.P. 79(a) requires all judgments to be entered in the civil docket.

not analogize the act determining the appealability of a judicial order to that determining the effectiveness of the Secretary's decision. *See Chem-Haulers, Inc. v. United States,* 536 F.2d 610, 615 (5th Cir.1976); *Statler Distributors v. Alexander,* 148 F.2d 74, 75 (1st Cir.1945). Instead, we must examine the statutory language of section 1395oo(f)(1) and the interpretation given by the agency charged with its administration to determine when the Secretary's decision became effective. *Id.* at 613–15.

Section 1395oo(f)(1) requires only that the Secretary "reverse, affirm or modify" the Board's decision within 60 days. There is no additional requirement that the decision must be entered on any docket or mailed within that 60-day review period.[11] The regulation promulgated under section 1395 oo(f)(1) provides only that the Secretary make her decision within 60 days and that she "promptly" notify the parties of her decision.[12]

In HCFA practice, once a Board decision is received for review, a "master control sheet" is prepared and attached to the file. As the file passes between the Deputy Administrator's Office and the Office of the Attorney-Advisor, this control sheet is signed and dated by those handling the file. In this fashion, a record is kept with regard to what action has been taken on the case. Record Vol. I at 141–43.

When the Deputy Administrator signs his decision, he hand-dates and signs the control sheet accompanying the file. The Secretary's position is that upon this act, her decision becomes "effective." In the instant case, the Deputy Administrator signed and dated both the decision and the control sheet on March 6, 1980, 59 days after the plaintiffs received the Board's decision. Thus, the Secretary maintains her decision was timely.

■ It is established that interpretations of a statute by the agency charged with its administration should weigh heavily absent a compelling reason to the contrary. *See, e.g., Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). This is not the precise situation before us, but we are persuaded that the Secretary's interpretation of section 1395oo(f)(1) is similarly entitled to some deference, especially where there is no compelling precedent[13] or reason tending to support an opposite view.[14] *See Chem-Haulers, Inc. v. United States,* 536

---

11. The legislative history of section 1395oo(f)(1) does not give any guidance as to when the Secretary's decision becomes effective.

12. See note 5, *supra.*

13. There is little case law on this issue. In *Statler Distribs. v. Alexander,* 148 F.2d 74 (1st Cir.1945), the court held that the agency's decision was "entered" only when signed and placed in the agency's files as a complete act and when a copy of the order was received by the petitioner. In *Amodio v. Reconstr. Fin. Corp.,* 191 F.2d 862 (Emer.Ct.App.1951), the agency's order became effective on the date entered, not when received by the claimant. In *Braniff Airways, Inc. v. Civil Aeronautics Bd.,* 379 F.2d 453 (D.C.Cir.1967), the court held that a Civil Aeronautics Board order became valid when it was adopted and entered, not when it was received by the parties. Finally, in *Chem-Haulers, Inc. v. United States,* 536 F.2d 610 (5th Cir.1976), we held that Interstate Commerce Commission orders are "entered" when the Commission's seal and the Secretary's signature are affixed to the order.

Each of these cases demonstrate only that the time at which an agency decision becomes final can be determined only through an examination of the statutes and regulations under which that agency operates.

14. The plaintiffs urge us to hold that the Secretary's decision does not become effective until it is mailed to prevent the Deputy Administrator from backdating his decisions. They allege that in *Humana, Inc. v. Califano,* Nos. 78–0584 and 78–0175 (D.D.C.1979), and *McCoy v. Califano,* No. C77–0389 L(A) (W.D.Ky. Feb. 27, 1980), the Secretary's delegate signed backdated decisions in order to create the appearance of meeting the 60-day time limit. This has, the plaintiffs claim, seriously compromised the integrity of the review process, and thus necessitates a "prophylactic" rule. The Secretary denies the plaintiffs' claim, but notes that the procedures in effect at the time of the decisions in the *McCoy* and *Humana* cases were later changed and were not the same procedures that existed at the time of the administrative review in this case. In any event, we decline to adopt such a prophylactic rule as the plaintiffs urge us to do.

F.2d at 615. We hold, therefore, that the Secretary's decision became effective on March 6, 1980, and that her reversal of the Board's decision was timely.[15]

## III. SCOPE OF JUDICIAL REVIEW.

Plaintiffs sought judicial review of the Secretary's decision pursuant to 42 U.S.C. § 1395oo(f); this section requires us to apply the standard of review applicable to actions arising under the Administrative Procedure Act. Our review is limited to determining whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." 5 U.S.C. § 706(2)(A) (1976).

The Medicare program is structured around the concept of reasonable cost. Under that concept, a provider is to be reimbursed only for the reasonable cost of providing medical services to Medicare beneficiaries. The Medicare statute sets forth only the broadest definitional parameters, requiring reasonable cost to be

> [T]he cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services. . . .

42 U.S.C. § 1395x(v)(1)(A). Beyond this threshold requirement, reasonable cost is to be determined under regulations promulgated by the Secretary "establishing the method or methods to be used, and the items to be included, in determining such costs. . . ." *Id.* These regulations must, however, take into account the direct and indirect costs necessary in the efficient delivery of covered services to Medicare beneficiaries so that such costs will not be borne by non-covered individuals. Conversely, the cost of rendering services to non-covered individuals is not to be borne by the Medicare program.

Pursuant to this statutory authority, the Secretary has promulgated regulations to reimburse providers for their reasonable costs incurred in rendering medical services to Medicare beneficiaries.[16] 42 C.F.R. §§ 405.401–488. At issue in this case is whether certain costs and returns on equity capital claimed by the plaintiffs are allowable under those regulations or the Medicare statute itself. The validity of the Secretary's regulations "will be sustained so long as [they are] 'reasonably related to the purposes of the enabling legislation'. . . ." *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973) (quoting *Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969)). *See also Springdale Convalescent Center v. Mathews,* 545 F.2d 943, 951 (5th Cir.1977); *Florida v. Mathews,* 526 F.2d 319, 323–24 (5th Cir.1976). Because the Secretary's interpretation of "reasonable costs" is entitled to "considerable deference," *Springdale Convalescent Center v. Mathews, supra,* at 951, the plaintiffs here have the "difficult burden" of proving that the Secretary's interpretation conflicts with the statutory scheme. *Id.* We note, however, that the Secretary's discretion "is not unfettered," and "[e]ach cost reimbursement regulation must approximate as closely as is practicable the direct and indirect costs of rendering services only to persons covered by the Act." *Id.* at 952 (citations omitted).

Thus, our review is a narrow one. The agency decision must be upheld as long

---

**15.** The plaintiffs also argue that, since the Secretary is to "promptly" notify the provider of the result of the review, *see* note 5, *supra,* it is reasonable to interpret "promptly" to mean on the day the decision is signed. They note that, in this case, the Secretary's decision was not mailed for five days after it was signed and dated. While the plaintiffs may have wished to have been more "promptly" informed of the Secretary's decision, the Secretary advanced plausible reasons for this five day delay in mailing the decision, and we do not believe her decision was untimely for this reason.

**16.** The Secretary's interpretation of these statutory and regulatory provisions is contained in a manual which has been distributed to fiscal intermediaries. The rulings contained in this "Provider Reimbursement Manual," while without the force of law, are entitled to be given important significance. *See Humana of Kentucky, Inc. v. Harris,* CCH Medicare and Medicaid Guide ¶ 31,610 (W.D.Ky.1981) (discussion of controlling weight of the Secretary's interpretations as contained in the Provider Reimbursement Manual).

as there is a rational basis for the Secretary's interpretation of the statute and the regulations. *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201, 1211 (5th Cir.1980), *cert. denied,* 450 U.S. 975, 101 S.Ct. 1506, 67 L.Ed.2d 809 (1981); *Florida v. Mathews, supra,* at 324–25.

The plaintiffs, however, suggest that we abandon the normal rule of deference in this case because the Board's decision differed in substantial part from the Secretary's final decision. The plaintiffs note that the members of the Board are required to be persons knowledgeable in this field, 42 U.S.C. § 1395*oo*(h), and that their decisions are final absent review by the Secretary. We have held, however, that the decision of the Board carries "no more weight on review by the Secretary than any other interim decision made along the way in an agency where the ultimate decision of the agency is controlling." *Homan & Crimen, Inc. v. Harris,* 626 F.2d at 1205. To this we added, "[t]he argument that the court should recognize the expertise of the members of the [Board] must be met with the assumption that those persons within the agency who assisted the Secretary in a contrary decision must be regarded as being equally expert." [17] *Id.*

## IV. THE MERITS.

### A. Stock Maintenance Costs.

■ During 1973, HCA incurred over $185,000 in expenses referred to by the Secretary as "stock maintenance costs." These costs consisted of (1) stock transfer and registration fees; (2) reports to stockholders; (3) stockholders' meetings; (4) legal and accounting fees incurred through SEC

filings and stockholders' meetings; and (5) public relations aimed at institutional investors. HCA claimed these expenses on its 1973 cost report, but the Secretary disallowed them because she found these costs were incurred primarily for the benefit of HCA's stockholders. The Secretary also held that these costs were not related to actual patient care or necessary to the rendition of patient care services. Therefore, she concluded, these costs could not properly be allocated from HCA to its member hospitals for Medicare reimbursement. The district court reversed the Secretary's decision, finding her denial of these costs "to be arbitrary and capricious, and contrary to law." Although the district court advances several strong arguments in opposition to the Secretary's position, we do not believe that the Secretary's interpretation is irrational or unreasonable. Thus, we must reverse the judgment of the district court on this claim.

The Medicare program reimburses a provider's costs only if they are not "unnecessary in the efficient delivery of needed health services...." 42 U.S.C. § 1395x(v)(1)(A). The issue here is whether stock maintenance costs are included in this definition. Shortly after the Medicare program began, the Secretary determined that stock maintenance expenses, while ordinary business expenses, were only tangentially related to the care of beneficiaries. Thus, they were not reimbursable.[18]

In making this determination, the Secretary focused on the primary purpose underlying each cost to determine whether there exists a sufficient nexus to patient care.[19]

---

**17.** The plaintiffs also assert that the Secretary's decision in this case is not entitled to deference because the Deputy Administrator did not personally consider the evidence. They also claim that the Deputy Administrator's decision conflicts with prior agency policy and that the review process is biased. We find none of these arguments to be persuasive. We note, however, that with regard to the first allegation: " '[T]he broad ideal that agency heads should do personally what they purport to do is for many functions impractical and unworkable.' The use of assistants in the administrative process is indispensable to the orderly and efficient expedition of great volumes of

work...." *Braniff Airways, Inc. v. Civil Aeronautics Bd.,* 379 F.2d 453, 461 (D.C.Cir. 1967) (quoting 2 Davis, *Administrative Law* § 11.07, at 66 (1958)).

**18.** In January, 1973, the Secretary promulgated this policy in Provider Reimbursement Manual § 2150.2B.1.; in August, 1973, it was reemphasized in Provider Reimbursement Manual § 2134.9.

**19.** The Secretary notes that her focus on the costs' primary purpose is quite similar to the use of a primary purpose test to determine

By using this method, the Secretary decided that stock maintenance costs are incurred primarily to render investment-related services to corporate shareholders, not patient care services to Medicare beneficiaries. For example, the Secretary notes, SEC filings are designed to ensure that investors have available adequate information in order to decide whether to buy, sell or hold a registrant's securities.[20] Annual meetings and reports provide existing and prospective shareholders with information concerning the corporation's financial condition and profitability.[21] These meetings also provide a forum in which stockholders can vote on resolutions affecting the corporation's profit-making activities and can elect directors who they believe will better guide the company in its financial operations. Stock transfer and registration fees facilitate sales of stock and provide the corporation with an orderly record of stock ownership, an expense primarily of benefit to stockholders. Finally, public relations directed at institutional buyers benefit corporate stockholders in so far as increased institutional purchases raise the price of their shares. Thus, the Secretary argues, stock maintenance costs are only incidentally related to health care.

The plaintiffs counter by insisting that a corporate provider must incur most of these costs in order to render medical services.[22] The plaintiffs point out that, in order for a corporation to function, it must hold meetings to elect directors, must distribute reports to shareholders, must incur stock transfer fees, and must incur legal and accounting fees in connection with SEC requirements. The plaintiffs, however, fail to make the critical distinction between costs that are necessary for the maintenance of a corporate structure and those that are necessary for providing medical services. *See American Medical International, Inc. v. Secretary of Health, Education and Welfare,* ·466 F.Supp. 605, 612–13 (D.D.C.1979), *aff'd,* 677 F.2d 118 (D.C.Cir.1981). While stock maintenance costs may be ordinary and necessary business expenditures of a corporate provider, this consideration is not controlling. The costs must be necessary to the furnishing of medical care. *Id.* Of course, some of the activities that give rise to stock maintenance costs are required by law. But those legal requirements are imposed solely to ensure that corporations are accountable to their current and prospective stockholders. They have no connection to Medicare services. Furthermore, as the Secretary notes, although HCA may be legally required to incur some of these costs to maintain its corporate status, this is a consequence of HCA's election to organize as a publicly-held corporation. Obviously, medical care can be furnished by non-corporate entities; therefore medical care can be rendered without incurring these disputed costs.[23]

In reversing the Secretary's disallowance of the stock maintenance costs, the district court relied heavily upon the Court of

---

whether an expense qualifies as a business expense deductible under 26 U.S.C. § 162 (1976 & Supp. V 1981). *See* 26 C.F.R. § 1.162–2(b)(1) (1982).

**20.** These filings also protect the interests of prospective shareholders by providing them with the complete picture of a corporation's financial condition before purchasing stock.

**21.** The Secretary also notes that annual reports serve the additional end of "selling" the company to prospective investors.

**22.** The Medicare regulations expressly recognize that corporations may participate as Medicare providers, 42 C.F.R. §§ 405.402(b)(5) and 405.429(a)(2).

**23.** The decision in *American Medical Int'l* also properly disposes of another argument made by the plaintiffs in this case:

Similarly, the primary purpose test answers plaintiffs' challenge to the Secretary's decision to reimburse certain costs of corporate organizing incident to the creation of the entity, while denying reimbursement for stock maintenance costs. The primary purpose of all costs incurred at the creation of the entity is to bring into existence a provider of medical services. As the entity survives, the stock maintenance costs have as their primary purpose the protection of stockholder interests in investment. This is a rational distinction justifying the different treatment accorded the different costs by the Secretary. 466 F.Supp. at 615.

Claims' decision in *AMI-Chanco, Inc. v. United States,* 576 F.2d 320 (Ct.Cl.1978). In *AMI-Chanco,* the court recognized that stock maintenance costs are largely incurred for the benefit of stockholders. However, the court gave conclusive weight to the fact that corporate providers are legally required to incur these costs, and held the Secretary's disallowance of these costs to be arbitrary and capricious.[24] We differ with the Court of Claims because we do not believe that the "primary purpose" test the Secretary utilizes here is unreasonable or irrational. Furthermore, we agree with the Secretary's position that even necessary business expenses must also be necessary to patient care in order to be reimbursed under Medicare. Although the *AMI-Chanco* court advanced other grounds for its decision that we could mention here, we prefer to address them indirectly through our discussion of the district court's opinion.

The district court held that the disallowance of stockholder maintenance costs conflicts with the Medicare regulation that prohibits inequitable treatment of proprietary and non-proprietary hospitals. *See* 42 C.F.R. § 405.402(b)(5). The court found that it is inconsistent for the Secretary to reimburse similar costs incurred by non-profit corporations, while denying such reimbursement to profit corporations. Yet "the purpose of annual meetings, filings, etc., of non-profit corporations is not for investment but, rather, to further the goal of providing improved medical care. On the other hand, the *primary* purpose of annual meetings, filings, etc., of profit corporations is to enhance investments." *American Medical International, Inc. v. Secretary*

of Health, Education and Welfare, 466 F.Supp. at 615 (emphasis in original). Of course, certain activities occurring at the profit corporation's annual meeting may relate to providing medical care. *Id.* But separating reimbursable costs from those that are not may require the Secretary to draw fine lines. "The problems of government are practical ones and may justify, if they do not require, rough accommodations. . . ." *Weinberger v. Salfi,* 422 U.S. 749, 769, 95 S.Ct. 2457, 2468, 45 L.Ed.2d 522 (1975). Consequently, we find the "primary purpose" test used by the Secretary to be reasonable and justifies the disparate treatment of profit and non-profit corporations. *American Medical International, supra,* at 615.

The district court also held that disallowing stock maintenance costs will cause necessary costs of rendering services to Medicare beneficiaries to be borne by non-Medicare patients in violation of 42 U.S.C. § 1395x(v)(1)(A). The fallacy in this argument is that the statute only refers to the necessary costs of rendering services; stock maintenance costs, as we have shown, fall outside this category.

Finally, the district court noted that HCA's stock maintenance costs are recognized as general and administrative expenses under generally accepted accounting principles. According to the court, to disallow these costs would be contrary to 42 C.F.R. § 405.406, which requires generally accepted accounting principles to be applied in determining reasonable costs.[25] Section 405.406, however, "only provides that accepted accounting principles be used in uniform record-keeping, not in determining

24. In *AMI-Chanco,* no public relations expenses were claimed—which, of course, are not required by law.

25. The district court explained: "The accounting profession does not recognize a separate category of 'stock maintenance costs.' Neither do other federal agencies, which consider these costs simply part of the ordinary and necessary expenses of corporate business." Record Vol. I at 39. The fact that other government agencies may allow stock maintenance costs is not determinative as to whether Medicare must reim-

burse those costs. Medicare does not reimburse all business expenses, but only those that are reasonably related to patient care. 42 U.S.C. § 1395x(v)(1)(A). "Accounting and legal principles appropriate in other contexts for other purposes have little persuasive force here because the question before us must be according to the Medicare regulations and the policies those regulations were designed to implement." *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130, 135 (D.C.Cir.1982). *Accord Gosman v. United States,* 573 F.2d 31, 46 n. 16 (Ct.Cl.1978).

costs allowable under the Medicare Act. The regulation is directed at the type of financial data and reports required of providers; it is not a regulation affecting the substantive provisions of the program as to what constitutes reimbursable costs." *American Medical International,* 466 F.Supp. at 623.[26]

The plaintiffs offer additional grounds in support of the district court's decision. The first relates to employee stock options. During 1973 HCA had three employee stock option plans. In order to implement these plans, HCA was required to incur many of the costs at issue. Stockholders' meetings were held to adopt each of the stock option plans and to amend such plans; registration statements were filed in connection with the options issued; and SEC filing requirements were a necessary cost of such plans. The plaintiffs note that the Secretary has determined that employee fringe benefits are allowable costs. Provider Reimbursement Manual §§ 2144.1–2144.4.[27] They note further that Medicare allows reimbursement of all of the costs associated with the company's stock option plans except for stock maintenance costs. Thus, they argue, because stock maintenance costs are required to implement HCA's stock option plans, there is no logical basis for disallowing them. In reply, the Secretary points out that the plaintiffs have received reimbursement for that portion of stock maintenance costs related to its employee stock option plans. This amount was paid because the Secretary believes that fringe benefits, like most other forms of employee compensation, are related to patient care. The remainder of the costs, she has determined, are related primarily to benefiting HCA's stockholders and, consequently, cannot be reimbursed.

Finally, the plaintiffs contend that the Secretary's reimbursement of interest expense and other costs incurred through debt is inconsistent with her disallowance of stock maintenance costs. Interest expense, along with other finance charges, is a reimbursable cost when the borrowed funds are used by a provider to render health care. The plaintiffs assert that stock maintenance costs are simply an aspect of equity financing. Thus, they conclude, it is unreasonable to reimburse debt expense and deny reimbursement of stock maintenance costs. We disagree. Interest on debts used solely for funding patient care facilities is primarily incurred for providing medical care. Debts not so used are not reimbursable.[28] To the extent that stock maintenance costs "may

---

**26.** The district court also held that these costs should be reimbursed so as not to contradict the Medicare policy that corporate providers should be allowed to attract and keep equity capital to maintain their Medicare services. Section 1395x(v)(1)(B) of the Medicare Act provides for a return on investment and the regulation adopted pursuant to the provision explains:

> Proprietary providers generally do not receive public contributions and assistance of Federal and other governmental programs in financing capital expenditures. Proprietary institutions historically have financed capital expenditures through funds invested by owners in the expectation of earning a return. A return on investment, therefore, is needed to avoid withdrawal of capital and to attract additional capital needed for expansion.

42 C.F.R. § 405.429(b)(1). The district court held that disallowance of the stock maintenance costs would contradict this principle; in support the court cited *AMI-Chanco v. United States, supra,* where that court held:

> By directing that corporate providers shall receive a reasonable return on equity capital,

Congress has declared that it considers a reasonable return on investment to be one of the costs of patient care which is reimbursable under the Act. Surely, if Congress meant to bolster the effectiveness of the Medicare program by offering the incentive of a return on equity to investors of capital, it also intended to provide reimbursement for stock maintenance costs, which by their very definition are essential elements of the process of attracting the equity capital necessary to provide patient care services. In fact, it is a contradictory policy which encourages the attraction of investment capital but disallows the costs of doing so, on the grounds that the latter costs are not related to patient care.

576 F.2d at 324. We believe that this argument is flawed for the reasons carefully drawn by the court in *American Medical Int'l,* 466 F.Supp. at 613–14, which we do not reiterate here.

**27.** The Provider Reimbursement Manual is discussed at note 16, *supra.*

**28.** *See* 42 C.F.R. § 405.419.

benefit medical services by assisting in the attraction of equity capital, this effect is too incidental to override the fact that the primary purpose of stock maintenance costs is to enhance investment." *American Medical Internationa, supra,* at 615 (emphasis omitted).[29]

In conclusion, we recognize that the plaintiffs have advanced strong arguments favoring the reimbursement of stock maintenance costs, but our review is limited to whether the Secretary's decision denying these costs is "arbitrary" or "capricious." We do not find that the Secretary's decision is irrational or inconsistent with the purpose of the enabling legislation. *See, e.g., Florida v. Mathews,* 526 F.2d at 323.[30] Thus, the judgment against the Secretary is reversed.

### B. Return on Equity in Goodwill.

■ During 1968 and 1969, HCA acquired 100% of the stock of nine hospital corporations. The purchase price of the hospitals included goodwill, defined by Medicare as the excess of the price paid to acquire a hospital over the fair market value of the hospital's tangible assets. Total goodwill from these nine acquisitions equalled $21,983,554.

Following each acquisition, HCA assumed complete management and control over the hospital's operation, installed new management and negotiated new contracts. Yet none of the acquired hospitals was subsequently dissolved by, or merged with, HCA. Rather, each continued to operate as a separate corporate entity. Moreover, none of the assets of the acquired hospitals was subsequently distributed to HCA. Instead, the assets continued to be held by the acquired corporations.

In 1973, HCA included the goodwill obtained in the purchase of the nine hospital corporations in establishing a value for its equity capital. HCA then used this value in determining its Medicare reimbursement claim for return on equity. This claim was denied by the Secretary. She notes that Medicare pays proprietary providers a "reasonable return on equity capital ... invested in the facility and used in the furnishing of ... services ...." 42 U.S.C. § 1395x(v)(1)(B). "Equity capital" is defined as the "*provider's investment in plant, property,* and *equipment* related to patient care ...." as well as net working capital maintained for the operation of patient care services. 42 C.F.R. § 405.-429(b)(1)(i) (emphasis added). The regulations also provide that investment in facilities is to be recognized on the basis of the "historical cost" used for depreciation. 42 C.F.R. § 405.429(b)(ii). "Historical cost," in turn, is defined as the "cost incurred by the present owner in acquiring the *asset.*" 42 C.F.R. § 405.415(b)(1) (emphasis added). Thus, under the regulations, return on equity capital may be paid only to the extent there is an investment in plant, property or equipment (*i.e.,* assets). Furthermore, the investment must be that of the provider. In each of its nine acquisitions, HCA purchased only stock. Because the purchases of the acquired hospitals' stock did not equate to a purchase of their assets, the nine hospital corporations continued to own the hospital facilities and continued as the "providers" of medical services. Thus, the Secretary says, HCA was not entitled to receive a return on equity capital. Only the individual hospital corporations, as providers, were qualified to make a claim. Their right to return on equity, however, was limited to their investment in plant, property, and equipment and to their net working capital. The price HCA paid for the corporate stock, and the goodwill which was shown on HCA's books, could not be claimed because those items did not reflect the "provider's investment." Following each of HCA's nine acquisitions, the

---

**29.** The remaining arguments plaintiffs raise in their briefs which we have not specifically addressed are less supportive of their position and have been amply replied to by the Secretary. Thus, we do not believe they warrant any discussion here.

**30.** We note that our result is in accord with that reached by the D.C.Circuit. *See American Medical Int'l v. Secretary of Health, Educ. and Welfare,* 677 F.2d 118 (D.C.Cir.1981).

"present owner" of the "assets" was the provider, and the cost which the provider incurred in acquiring the assets did not include the "goodwill" which HCA claimed. Consequently, HCA's reimbursement claim was denied.

The plaintiffs point out that denial of reimbursement here draws an arbitrary distinction between stock acquisitions, where a return on goodwill is denied, and statutory mergers, where it is allowed.[31] We disagree. It is an elementary principle of corporate law that a corporation and its stockholders are separate entities and that the title to corporate property is vested in the corporation and not in the owners of the corporate stock. *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). When there is a statutory merger, a new "provider" is created and ownership of the facility changes hands. Thus, Medicare will pay an increased return on equity capital based on the fact that the corporate assets have been transferred to a new provider and have a new "historical cost" upon which the return is calculated and paid. However, in stock purchases of providers, ownership of the corporate assets remains in the hands of the original provider whose equity capital is limited to the assets' original historical cost.[32]

Our decision in *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201 (5th Cir.1980), *cert. denied,* 450 U.S. 975, 101 S.Ct. 1506, 67 L.Ed.2d 809 (1981), is controlling here. In *Homan,* Medenco, Inc., through a wholly owned subsidiary, purchased 100% of the stock of Homan & Crimen, Inc., a corporation doing business as Southwestern General Hospital. Immediately following the purchase, Medenco assumed complete management and control over the operation of the hospital. However, Homan & Crimen, Inc., was never liquidated[33] and continued as the owner of the hospital facility. Subsequently, Homan & Crimen d/b/a Southwestern General Hospital submitted Medicare cost reports for the 1972 and 1973 fiscal years, claiming a return on equity capital for the amount by which the price paid by Medenco exceeded the net book value of the hospital assets. Homan & Crimen's claim was disallowed by the Secretary. In upholding the Secretary's decision, we held that Medenco's 100% stock acquisition of Homan & Crimen was not a purchase of its assets. Thus, Homan & Crimen, not Medenco, was the owner of the hospital facility and continued as the provider. In conclusion we said:

> [E]quity capital upon which a return may be based must be the provider's and it must be related to patient care. In view of our holding that Homan & Crimen is the provider because its separate identity should not be disregarded and that Medenco's investment in Homan & Crimen stock was not an investment related to patient care, it follows that plaintiffs are not entitled to a return on the purchase price of stock.

626 F.2d at 1210.

Therefore, in light of *Homan,* it is clear that the goodwill HCA purchased through the 100% stock acquisitions can not be considered as part of HCA's equity capital upon which a return may be claimed. *See*

---

**31.** We note that, under 42 C.F.R. § 405.-429(b)(2), the Secretary excludes from equity capital goodwill purchased in acquisitions effected after July 1970. However, goodwill purchased in connection with hospital assets and facilities prior to that date can be included in the provider's equity capital for the purposes of computing a return on investment, 42 C.F.R. § 405(b)(3). Because HCA's purchase of the goodwill at issue was effected prior to 1970, it included this goodwill in its 1973 cost year as part of its equity capital. Thus, our inquiry is limited to whether goodwill purchased through 100% stock acquisitions prior to July 1970 should be includable in equity capital.

**32.** The distinction drawn between stock purchases and statutory mergers is set forth in 42 C.F.R. § 405.415(*l*).

**33.** The significance of non-liquidation lies in the fact that where a Medicare provider acquires 100% of the stock of another corporate provider and shortly thereafter liquidates the acquired company, these two steps have been viewed as a purchase of assets and goodwill can be computed as part of the purchaser's equity capital. *See, e.g., Pacific Coast Medical Enter. v. Harris,* 633 F.2d 123 (9th Cir.1980).

*also American Medical International, supra; Monterey Life Systems v. United States,* 635 F.2d 821 (Ct.Cl.1980).

The plaintiffs argue that section 1214 of the Provider Reimbursement Manual expressly allows goodwill purchased in pre-1970 transactions to be included in the return on equity capital computation. Section 1214 provides in pertinent part:

Goodwill purchased in an acquisition prior to August 1970 of an existing organization is includable in the provider's equity capital. The amount of goodwill is determined in accordance with generally accepted accounting principles.

The manual provision, according to the plaintiffs, does not require the purchase of a "facility" or "assets," but rather requires only the acquisition of an "existing organization." Thus, since the nine hospital corporations acquired by HCA through 100% stock purchases were "existing organizations," it is entitled to a return on this goodwill.

We believe that the word "organization" as used in section 1214 must be read in conjunction with the language of section 1395x(v)(1)(B) and 42 C.F.R. § 405.429, which govern the payment of return on equity. Section 1395x(v)(1)(B) refers to equity capital as that capital invested in a "facility," and section 405.429 interprets the word "facility," to mean "plant, property, and equipment." The regulation also provides that a provider's "investment in facilities" is to be recognized on the basis of "historical cost," which, in turn, is defined as the cost incurred by the present provider in acquiring the "asset." [34]

Thus, we find that the Secretary's disallowance of reimbursement for equity capital based on goodwill to be reasonable and affirm the district court on this issue.

### C. Costs of Unconsummated Acquisitions.

The next issue also arises from HCA's acquisition program. In 1973, HCA evaluated several hospitals for possible acquisition, ultimately purchasing some but deciding not to acquire others. The costs incurred in making these evaluations were claimed on HCA's home office cost report and allocated to the individual providers operated by HCA (all of which are plaintiffs in this suit). The plaintiffs' fiscal intermediaries allowed Medicare reimbursement for the costs incurred in evaluating the facilities which were actually purchased. However, they denied Medicare reimbursement for the costs incurred in investigating the facilities which were not purchased.[35] In ultimately disallowing these costs, the Secretary noted that HCA is a chain organization engaged in the business of acquiring hospitals so as to increase corporate profits. While Medicare reimburses a provider's reasonable costs, it does not reimburse the costs of seeking additional earnings to the extent that those costs are unrelated to patient care. Here, she held, no patient care services resulted from the unconsummated acquisition costs and, consequently, reimbursement of those costs had to be denied.

The plaintiffs advance several arguments in opposition to the Secretary's decision not to reimburse unconsummated acquisition costs, most of which can be dealt with summarily. First, they argue that HCA's acquisition program enabled it to lower health care costs. By acquiring more member hospitals, HCA was able to buy more items in bulk and was able to spread fixed costs over a greater number of units. While the costs incurred in investigating unacquired hospitals did not in themselves result in economies of scale (in that they did not result in additional member hospitals), these ex-

---

**34.** HCA also argues that § 1214 requires the Secretary to apply generally accepted accounting principles in determining whether or not goodwill is includable in the return on equity capital computation. We find that the second sentence of § 1214 requires only that, if a return on equity is to be paid for goodwill, the *amount* of goodwill must be determined in accordance with generally accepted accounting principles.

**35.** The parties stipulated that the amount of disallowed costs was $87,802; Medicare's reimbursement, if allowed, would be approximately $26,000.

penses were an unavoidable cost of the acquisition program which did effect successful acquisitions. The plaintiffs cite 42 C.F.R. § 405.451(a), which requires the reimbursement of all "necessary and proper" costs, and they assert that these unconsummated acquisition costs were both necessary and proper. Section 405.451(a), however, permits the payment of necessary and proper costs only if they are "*incurred in rendering the services [covered under the Medicare Act and related to the care of beneficiaries].*" (Emphasis added.) Since the acquisitions here were never consummated, the costs were never "incurred in rendering ... services," and never became related to the care of beneficiaries. Furthermore, we agree with the Secretary's position that these costs are too remotely related to the provision of health care to allow them to be considered reasonable costs. The plaintiffs' argument is similar to that raised and rejected by the court in *Gosman v. United States,* 573 F.2d 31 (Ct.Cl.1978). In *Gosman,* the plaintiffs sought reimbursement for advertising and public relation expenses designed to increase the occupancy of a group of nursing homes. The plaintiffs there claimed that by increasing the occupancy rate, the per diem cost of caring for Medicare beneficiaries would be lower, thus benefiting the program. This argument was rejected by the court, which held that the Medicare Act and its regulations preclude the reimbursement of "indirect expenditures only tangentially or speculatively related to the actual care of Medicare beneficiaries." *Id.* at 38. *See also American Medical International v. Secretary of Health, Educ. & Welfare,* 466 F.Supp. at 613 n. 3 (fact that stock maintenance costs allow equity capital and thus reduces reimbursable finance costs incurred through debt too attenuated to justify reimbursement).

Nonetheless, the plaintiffs cite section 1395x(v)(1)(A), which requires Medicare to "pay its own way" so that the costs of delivering care to patients covered by Medicare "will not be borne by individuals not so covered ...." Thus, they argue that, if these unsuccessful acquisition costs are not reimbursed by Medicare, they will be borne in their entirety by non-Medicare patients, notwithstanding the benefit realized by Medicare from these costs. As previously noted, unconsummated acquisition costs are not necessary costs of covered services and, as a result, do not fall within the cost-shifting prohibition. Indeed, if HCA's cost-shifting argument were to prevail, "no cost could ever be disallowed for reimbursement purposes because to do so would tend to shift the cost to non-Medicare patients." *Pasadena Hosp. Association v. United States,* 618 F.2d 728, 735 (Ct.Cl.1980).

The plaintiffs also seek support from 42 C.F.R. § 405.429, the return on equity capital regulation, and from 42 C.F.R. § 405.402(b)(6), which states that there should be "recognition of the need of hospitals ... to make improvements." Neither provision requires reversal of the Secretary's determination. As the Secretary explains, section 405.429 "does not magically transform all expansion expenses, including those connected with unsuccessful ventures, into reimbursable costs. If that were the effect, virtually all expenses ... would be reimbursable without regard to their relationship to patient care." Brief for Appellee/Cross-Appellant at 57–58. Similarly, the general policy of section 405.402(b)(6), which recognizes the need for hospitals to make improvements, is inapposite here. The hospitals being investigated were not acquired and, consequently, no improvements were made and no patients were benefited.

Finally, the plaintiffs argue that the Secretary's disallowance of HCA's unconsummated acquisition costs is contrary to Medicare's treatment of other home office costs. A number of home office management decisions result in abandoned efforts, the costs of which are not challenged by Medicare. These include costs associated with investigating computer installations, shared services, litigation and personnel recruitment. The Secretary distinguishes reimbursement of these costs on the ground that these expenses are more closely related to the improvement or maintenance of health

care services provided by existing facilities. In contrast, the Secretary argues, HCA's acquisition program was directed primarily at establishing itself as a "growth industry" among potential stockholders. In order to obtain more investors, HCA needed to expand by purchasing additional profitable hospitals. She argues that the primary purpose of HCA's unconsummated acquisition costs was to prevent HCA from making financially disadvantageous acquisitions, which might deplete corporate resources and lower corporate profits. Thus, she concludes, the principal benefit of these costs was felt by HCA and its stockholders, not HCA's Medicare patients, and to reimburse these costs would be inappropriate. Although the Secretary has drawn a fine line here, we do not find the distinction she makes to be irrational. As the Fourth Circuit noted in *Fairfax Hosp. Association v. Califano,* 585 F.2d 602, 606 (4th Cir.1978):

> Particularly in a program as complex as the Medicare program, with its large number of providers and suppliers ... the Secretary in his regulations may make, indeed he must make, "rough accommodations ..." using generalized classifications governing the methods of calculating "reasonable cost" when it is obvious that individualized cost calculations are both not administratively practical and unduly expensive.

*See also American Hospital Management Corp. v. Harris,* 638 F.2d 1208, 1212 & n. 7 (9th Cir.1981). Thus, we affirm the district court on this issue.

### D. Capitalization of Return on Equity in Aircraft.

The final issue we must contend with requires us to draw a distinction between reimbursement for necessary and proper costs of patient care and payment of a return on equity capital invested in hospital facilities. During 1973 HCA owned three aircraft which it used for current hospital operations, construction of new hospitals, and carrying out its acquisition activities. The issue here is whether, to the extent the aircraft were used for construction and ac-

quisition activities, a return on equity may be capitalized and added to the historical cost of the new facilities constructed.

The plaintiffs' contentions can best be explained through the use of an example: Suppose that HCA had invested $100,000 in an airplane with a useful life of 10 years and that it used the airplane for current hospital operations 75% of the time, and for hospital construction activities 25% of the time. Assume further that the airplane is in its third year of operation, that the return on equity paid by Medicare that year is 10%, and that the airplane is depreciated on a straightline basis.

Medicare would allow $7,500 ($100,000 × 75% × 1/10) [36] in depreciation for that portion of the aircraft used for current operations. Moreover, for that part of the aircraft used in construction activities, HCA would be allowed to capitalize depreciation of $2,500 ($100,000 × 25% × 1/10) and add this amount to the historical cost of the completed facilities to be reimbursed over a gradual basis.

HCA would also be paid a return on net equity for that portion of the aircraft used for current operations. HCA's net equity in the aircraft by the third year would be $80,000 ($100,000 original investment minus two years depreciation of $20,000—$7,500 per year attributed to current operations, and $2,500 per year attributed to construction operations). Thus, HCA's return would equal $6,000 ($80,000 [net equity] × 10% [rate of return] × 75% [time used for current operations]).

At issue here is whether HCA should be allowed to compute a return on equity for that portion of the aircraft used in construction activities, and then add that amount to the historical cost of the completed facilities. If so, then HCA would be allowed to capitalize a current return on equity of $2,000 ($80,000 [net equity] × 10% [rate of return] × 25% [time used for construction activities]).

---

**36.** This assumes that the airplane has a zero salvage at the end of its useful life.

HCA's fiscal intermediaries would not allow such a return, whether capitalized or not. The plaintiffs argue, however, that the applicable Medicare statute and regulations authorize HCA to capitalize a return on equity in the aircraft during the time it was used for construction. They note that the "historical cost" of a facility (upon which a return on equity capital is based) is defined in 42 C.F.R. § 405.415(b) as "the *cost* incurred in acquiring the asset." (Emphasis added.) Because, they contend, a return on equity capital is a "reasonable cost" under Medicare, this "cost" must be added to the "historical cost" of the buildings under construction. The Secretary contends, on the other hand, that the intermediaries properly disallowed the capitalization of such a return because return on equity capital is not a "cost." Thus, the crux of this issue is whether a return on equity capital is a "cost" under the Medicare Act.[37]

In support of their position, the plaintiffs note that 42 C.F.R. § 405.402(c) refers to "*costs* such as depreciation, interest on borrowed funds, a return on equity capital (in the case of proprietary providers), and other costs. . . ." (Emphasis added.) They also note that section 405.402(f) provides that "a *return on equity capital* of proprietary facilities is an allowable *cost* in profit-making organizations." (Emphasis added.) Moreover, they also note that, for example, we said in *Homan & Crimen, Inc. v. Harris, supra,* at 1205, the Secretary's regulations "allow reimbursement of indirect costs required for patient care, such as depreciation on buildings and equipment, interest incurred on loans, and *a return on equity capital.*" (Emphasis added.) But while the plaintiffs cite several instances where both

the Medicare regulations and judicial decisions do refer to a return on equity as a "cost," we believe they fail to take into account the legislative history of the Medicare reimbursement scheme and the weight of recent court decisions specifically focusing on this question.

 Nowhere in the Medicare regulations is the word "cost" defined. It is used interchangeably with the words "allowance" and "expense" to mean something which is paid under the Medicare statute. Because corporate providers are paid a return on equity capital, the regulations and the courts often refer to this return as a "cost," probably because a return on equity capital is included in the provider's program reimbursement. However, a return on equity is a profit, not a cost, and it has its own independent basis in the Medicare Act. While reimbursable expenses paid by Medicare all fall under the "reasonable costs" provision, 42 U.S.C. § 1395x(v)(1)(A), a return on equity capital is provided for under section 1395x(v)(1)(B). Moreover, recent judicial decisions have carefully examined the legislative history of the return on equity capital provision and have demonstrated persuasively that a return on equity is not a "reasonable cost" as contemplated by the Medicare Act. *See St. Francis Hospital Center v. Heckler,* 714 F.2d 872 (7th Cir. 1983); *Hospital Authority of Floyd County, Georgia v. Heckler,* 707 F.2d 456 (11th Cir. 1983); *Saline Community Hospital Association v. Schweiker,* 554 F.Supp. 1133 (E.D. Mich.1983). We believe these decisions to be sound and do not believe that reiterating the courts' analyses is necessary. Thus, because a return on equity in aircraft used for construction is not a "cost," such as depreciation of the aircraft, it cannot be added to

**37.** The exact facts are as follows: HCA's net equity in aircraft was $480,000, of which $135,833 was attributable to current hospital operations, $305,459 was attributable to construction activities, and $38,708 was attributable to potential acquisitions which did not materialize. For simplicity, we have assumed that the aircraft was not used in connection with acquisition activities. Less than 10% of the use of HCA's aircraft was attributable to acquisition activities, and, as the plaintiffs note, "whether a return on equity is allowable to the extent that the aircraft was used in acquisition activities is dependent on the Court's resolution of the acquisition costs issue. . . ." Brief of Appellants at 53 n. 1. Since we have already decided that unconsummated acquisition costs are not reimbursable, *see* section III.C., *supra,* the plaintiffs' would not be allowed any, return on equity here even if we were to accept the plaintiffs contention that return on equity is a cost.

the "historical cost" of the facilities being constructed.[38] Thus, we affirm the district court's judgment on this issue.

## V. CONCLUSION.

The plaintiffs have advanced many compelling arguments in support of their position on all four issues. Were we making the agency decision or devising Medicare regulations we might well adopt the outcome they urge upon us. We must be mindful, however, that the standard of our review requires that we uphold the Secretary's decision if it is reasonably consistent with the statute and is not arbitrary or capricious. We are unconvinced that the Secretary's determination is unreasonable or irrational. Thus, we affirm the district court's judgment against the plaintiffs, but reverse the district court's judgment against the Secretary. The plaintiffs shall bear the costs of this appeal.

AFFIRMED IN PART and REVERSED IN PART.

---

**38.** The other arguments plaintiffs offer in support of their position all presume that return on aircraft equity is a "cost;" *see* Brief of Appellants at 58–66. Since we find this presumption to be false, we do not address these remaining contentions.